# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2013AP416 |
| COMPLETE TITLE: | Peggy Z. Coyne, Mary Bell, Mark W. Taylor, Corey Otis, Marie K. Stangel, Jane Weidner and Kristin A. Voss,<br>            Plaintiffs-Respondents,<br>        v.<br>Scott Walker and Scott Neitzel,<br>            Defendants-Appellants-Petitioners,<br>Anthony Evers,<br>            Defendant-Respondent. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 361 Wis. 2d 225, 862 N.W.2d 606)
(Ct. App. 2015 – Published)
PDC No. 2015 WI App 21

| | |
|---|---|
| OPINION FILED: | May 18, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 17, 2015 |

| SOURCE OF APPEAL: | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Amy R. Smith |

| JUSTICES: | |
|---|---|
| CONCURRED: | ABRAHAMSON, J., concurs, joined by BRADLEY, A.W., J.<br>PROSSER, J. concurs |
| DISSENTED: | ROGGENSACK, C.J. dissents, joined by ZIEGLER, J. and BRADLEY, R.G., J.<br>ZIEGLER, J. dissents, joined by BRADLEY, R.G., J. |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendants-appellants-petitioners, the cause was argued by *David V. Meany*, assistant attorney general, with whom on the briefs was *Daniel P. Lennington*, assistant attorney general, *Andrew C. Cook*, deputy attorney general and *Brad D. Schimel*, attorney general.

For the plaintiffs-respondents, there were briefs by *Susan M. Crawford*, *Lester A. Pines*, *Aaron G. Dumas*, and *Cullen Weston Pines & Bach LLP*, Madison, and *Randall Garczynski*, Wisconsin Education Association, Madison and oral argument by *Susan M. Crawford*.

For the defendant-respondent, there briefs by *Ryan Nilsestuen*, *Janet A. Jenkins*, and Wisconsin Department of Public Instruction, Madison, and oral argument by *Ryan Nilsestuen*.

There was an amicus curiae brief by *Richard M. Esenberg*, *Charles J. Szafir*, *Brian W. McGrath*, and Wisconsin Institute for Law & Liberty, Milwaukee on behalf of Wisconsin Manufacturers & Commerce, Metropolitan Milwaukee Association of Commerce, School Choice of Wisconsin, the Honorable Jason Fields, and the Honorable Scott Jensen. Oral argument by *Richard M. Esenberg*.

There was an amicus curiae brief by *Richard F. Verstegen*, *Michael J. Julka*, *M. Tess O'Brien-Heinzen*, and *Boardman & Clark LLP*, Madison on behalf of The Wisconsin Association of School Boards and School Administrators Alliance. Oral argument by *Michael J. Julka*.

**2016 WI 38**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP416
(L.C. No. 2011CV4573)

STATE OF WISCONSIN        :        IN SUPREME COURT

Peggy Z. Coyne, Mary Bell, Mark W. Taylor,
Corey Otis, Marie K. Stangel, Jane Weidner and
Kristin A. Voss,

       Plaintiffs-Respondents,

  v.

Scott Walker and Scott Neitzel,

       Defendants-Appellants-Petitioners,

Anthony Evers,

       Defendant-Respondent.

**FILED**

**MAY 18, 2016**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*


¶1 MICHAEL J. GABLEMAN, J. This is a review of a published decision of the court of appeals[1] affirming the Dane County circuit court's[2] grant of summary judgment in favor of Peggy Z. Coyne, Mary Bell, Mark W. Taylor, Corey Otis, Marie K.

---

[1] Coyne v. Walker, 2015 WI App 21, 361 Wis. 2d 225, 862 N.W.2d 606.

[2] The Honorable Amy Smith, presiding.

Stangel, Jane Weidner and Kristin A. Voss ("Coyne"). Coyne sought a declaratory judgment that 2011 Wisconsin Act 21 ("Act 21") is unconstitutional as applied to the Superintendent of Public Instruction ("SPI") and the Department of Public Instruction ("DPI"). Among other things, Act 21 amended portions of Wis. Stat. ch. 227, which governs the procedures for administrative rulemaking and now allows the Governor (and in some instances the Secretary of Administration) to permanently halt the rulemaking process. The circuit court concluded that Act 21 is unconstitutional as applied to the SPI because it gives superior authority over public instruction to officers who are not subordinate to the SPI. As a result, it permanently enjoined Governor Scott Walker and Secretary of Administration Michael Huebsch[3] from proceeding thereunder with respect to the SPI.

¶2  The court of appeals affirmed, largely adopting the reasoning of the circuit court. Coyne v. Walker, 2015 WI App 21, ¶36, 361 Wis. 2d 225, 862 N.W.2d 606. The court of appeals relied on our decision in Thompson v. Craney, 199 Wis. 2d 674, 546 N.W.2d 123 (1996), specifically noting that in Thompson we determined that rulemaking is a supervisory power of the SPI. Coyne, 361 Wis. 2d 225, ¶¶23-24. Applying Thompson's reasoning,

---

[3] After we accepted the petition for review in this case Scott Neitzel replaced Huebsch as the Secretary of Administration. Consequently, on June 18, 2015, Huebsch was removed from the caption and Neitzel was added as a defendant-appellant-petitioner.

the court of appeals concluded that although the Legislature has the authority to give, not give, or take away the SPI's supervisory powers, "[w]hat the legislature may not do is give the SPI a supervisory power relating to education and then fail to maintain the SPI's supremacy with respect to that power." Id., ¶25.

¶3 The issues presented for our consideration are threefold. The first is whether administrative rulemaking is a supervisory power of the SPI and DPI. The second is whether Article X, § 1 of the Wisconsin Constitution allows the Legislature to vest the supervision of public instruction in any "other officers" it chooses. The third is whether Act 21 vests the supervision of public instruction in the Governor and the Secretary of Administration by giving them the authority to prevent the SPI and DPI's promulgation of rules.

¶4 We hold that Act 21 is unconstitutional and therefore void as applied to the Superintendent of Public Instruction and his subordinates. Article X, § 1 requires the Legislature to vest the supervision of public instruction in officers of supervision of public instruction. The current statutory scheme requires the SPI to promulgate rules in order to supervise public instruction. Because Act 21 does not provide a way for the SPI and DPI to proceed with rulemaking if the Governor or Secretary of Administration withholds approval, Act 21 gives the Governor and the Secretary of Administration the power to "manage, direct, or oversee" the primary means by which the SPI and DPI are required to carry out their supervisory duties.

3

Thus, Act 21 unconstitutionally vests the supervision of public instruction in officers who are not officers of supervision of public instruction in violation of Article X, § 1. Consequently, Act 21 is void as applied to the SPI and his subordinates.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. 2011 Wisconsin Act 21

¶5 On May 23, 2011, Governor Walker signed into law 2011 Wisconsin Act 21. At the heart of this controversy are the provisions of Act 21 that changed portions of Wis. Stat. ch. 227 sub. II (2009-10), the Wisconsin Administrative Procedure Act. This Act prescribes the procedures state agencies must follow in order to promulgate administrative rules. Three sections of Act 21 are especially relevant to the present case: Section 4, Section 21, and Section 32.

¶6 First, Section 4 of Act 21 amended Wis. Stat. § 227.135(2) (2009-10). Wisconsin Stat. § 227.135(2) previously required agencies that had prepared a "scope statement"[4] to submit that scope statement to the Legislative Reference Bureau for publication in the administrative register and to "the individual or body with policy-making powers over the subject matter of a proposed rule" for approval. Wisconsin Stat. § 227.135(2) now additionally requires an agency that has

---

[4] To begin the rule-drafting process, agencies must prepare a scope statement that, among other things, describes the objectives, policies, authority, and use of government resources that the rule may affect. See Wis. Stat. § 227.135(1).

4

prepared a scope statement to submit the scope statement to the Governor for approval. The agency may not submit the scope statement to the Legislative Reference Bureau for publication in the Administrative Register nor "perform any activity in connection with the drafting of a proposed rule" unless and until the Governor approves the scope statement in writing. Wis. Stat. § 227.135(2).

¶7 Second, Section 21 of Act 21 amended Wis. Stat. § 227.138(2) (2009-10) and renumbered the subsection to Wis. Stat. § 227.137(6). Wisconsin Stat. § 227.138(2) previously required only those agencies listed in Wis. Stat. § 227.137(1) to receive the Secretary of Administration's approval to submit proposed rules that could result in costs of $20,000,000 or more to the Legislature. Wisconsin Stat. § 227.137(6) now requires all agencies to receive the Secretary of Administration's approval to submit such proposed rules to the Legislature.[5]

¶8 Third, Section 32 of Act 21 created Wis. Stat. § 227.185. Prior to Act 21, agencies would submit final drafts of proposed rules directly to the Legislature for review. See Wis. Stat. §§ 227.135-.19 (2009-10). Wisconsin Stat. § 227.185 now requires agencies to submit any final draft of a proposed

---

[5] Wisconsin Stat. § 227.137(7) requires the Secretary of Administration to approve the rule if the "agency has adequately addressed the issues raised during the department [of administration]'s review of the rule," but the determination of whether the agency has "adequately addressed the issues" is left to the discretion of the Secretary of Administration.

rule to the Governor for approval before submitting the draft rule to the Legislature.[6] The Governor then has sole discretion to approve or reject the rule. Wis. Stat. § 227.185. An agency may not submit the proposed rule to the Legislature for review unless the Governor "has approved the proposed rule in writing." Id.

## B. The Proceedings Below

¶9    The Coyne parties[7] filed an action pursuant to Wis. Stat. § 806.04 seeking declaratory judgment and injunctive relief in the Dane County Circuit Court on October 11, 2011. The complaint named as defendants Governor Walker, Secretary of Administration Huebsch, and Superintendent Anthony Evers, all in their official capacities, and it sought to enjoin the

---

[6] Specifically, Wis. Stat. § 227.185 states,

> After a proposed rule is in final draft form, the agency shall submit the proposed rule to the governor for approval. The governor, in his or her discretion, may approve or reject the proposed rule. If the governor approves a proposed rule, the governor shall provide the agency with a written notice of that approval. No proposed rule may be submitted to the legislature for review under s.227.19(2) unless the governor has approved the proposed rule in writing.

[7] Peggy Z. Coyne and Mary Bell are taxpayers and school teachers who are the current presidents of Madison Teacher Inc., the labor organization that represents most employees of the Madison Metropolitan School District, and the Wisconsin Education Association Counsel, a labor organization representing thousands of teachers throughout Wisconsin, respectively. Corey Otis and Jane Weidner are taxpayers and teachers in Wisconsin public schools. Kristin A. Voss, Marie K. Stangel, and Mark W. Taylor are taxpayers and parents whose children attend and receive services from Wisconsin public schools.

defendants from proceeding with rulemaking under Act 21. The complaint alleged that by requiring the SPI and DPI to obtain the Governor's and the Secretary of Administration's approval to proceed with rulemaking, Act 21 gives the Governor and the Secretary of Administration equal or superior authority to that of the SPI over the supervision of public instruction. Consequently, the complaint alleged that Act 21 violates Article X, section 1 of the Wisconsin Constitution and is inconsistent with our holding in Thompson.

¶10 Superintendent Evers filed an answer agreeing with Coyne; he has taken the same position as Coyne throughout this litigation. Governor Walker and Secretary Heubsch[8] filed a motion to dismiss the case for lack of standing. Prior to disposition of that motion, Coyne filed a motion for summary judgment. On April 6, 2012, the circuit court denied the Governor's motion to dismiss, and thereafter the Governor answered the complaint. On May 25, 2012, the Governor filed a motion for summary judgment and opposed Coyne's previously filed motion.

¶11 The circuit court denied the Governor's motion for summary judgment and granted Coyne's motion, concluding that "under the analysis set forth in Thompson, Act 21 as applied to this case violates the Wisconsin Constitution." Accordingly, the circuit court declared void the provisions of Act 21 that

---

[8] For ease of reading, we will refer mainly to the Governor, though our analysis and conclusion apply with equal force to the Secretary of Administration.

7

"require approval of the Governor or the Secretary of the Department of Administration over the administrative rule-making activities in which the State Superintendent of Public Instruction engages or supervises, with respect to the supervision of public instruction."

¶12 The Governor appealed, arguing that administrative rulemaking is not a supervisory power of the SPI and that even if it were a supervisory power, the Legislature is free to "divvy up" the supervisory powers of the SPI among any "other officers" as it sees fit. Coyne, 361 Wis. 2d 225, ¶¶21, 25. Finally, the Governor argued that Act 21 does not impede the SPI's ability to make or authorize rules; thus, Act 21 does not place the Governor in a superior role to the SPI relative to rulemaking or public instruction. Id., ¶¶27, 29.

¶13 The court of appeals rejected each of these arguments and affirmed the circuit court. Id., ¶36. The court of appeals noted that we previously held that rulemaking is a supervisory power of the SPI. Id., ¶¶21-24 (citing Thompson, 199 Wis. 2d 674). It reasoned, "the practical effect of Act 21" is to give the Governor "the power to decide that there will be no rule or rule change on a particular subject, irrespective of the judgment of the SPI." Id., ¶28. The court went on to highlight the tension Act 21 created between the Governor and the SPI: "[i]t seems beyond reasonable dispute that a Governor at loggerheads with an SPI over the content of a proposed rule . . . could use the threat to withhold approval as a means of affecting the rule content." Id., ¶35. As a result, the court

8

of appeals concluded that Act 21 places the Governor in a superior position to the SPI as to the supervision of public instruction; consequently, the court found the challenged provisions of Act 21 unconstitutional as applied to the SPI. Id., ¶36. The Governor appealed, and we granted review on June 12, 2015.

## II. STANDARD OF REVIEW

¶14 We review a grant of summary judgment de novo, independently applying the same methodology as the circuit court and the court of appeals while benefitting from their analyses. Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶16, 360 Wis. 2d 129, 857 N.W.2d 136. Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2).

¶15 This case requires us to interpret Article X, § 1 of the Wisconsin Constitution. "We interpret provisions of the Wisconsin Constitution de novo." Polk Cty. v. State Pub. Def., 188 Wis. 2d 665, 674, 524 N.W.2d 389 (1994). This court turns to three sources to interpret provisions of the Wisconsin Constitution: "(1) the plain meaning of the words in the context used, (2) the historical analysis of the constitutional debates and of what practices were in existence [at the time the provision was drafted or amended]; and (3) the earliest interpretation of the provision by the Legislature as manifested

in the earliest law passed following the adoption of the constitution." Id.

### III. DISCUSSION

#### A. Administrative Rulemaking

¶16 Prior to undertaking our constitutional analysis, it is important to explain what rulemaking is, the role that it plays in our system of government, and how Act 21 modified the rulemaking process.[9]

¶17 Agencies are governmental bodies created by the Legislature in order to facilitate the efficient functioning of government by implementing the policy decisions of the Legislature.[10] "Agency" is defined very broadly in Wisconsin: "'Agency' means a board, commission, committee, department or officer in the state government, except the governor, a district attorney or a military or judicial officer." Wis. Stat. § 227.01(1). The DPI is a "department in the state government"

---

[9] Administrative rulemaking is a complicated process, and we do not endeavor to explicate the required steps for each agency nor the requirements of each subdivision of Wis. Stat. ch. 227. We merely provide a general summary of the process.

[10] See generally Wis. Stat. § 227.19(1)(b) ("The legislature recognizes the need for efficient administration of public policy. . . . The delegation of rule-making authority is intended to eliminate the necessity of establishing every administrative aspect of general public policy by legislation."); Wis. Stat. ch. 15, Structure of the Executive Branch; Wis. Stat. § 15.001(2)(a) ("As the chief administrative officer of the state, the governor should be provided with the administrative facilities and the authority to carry out the functions of the governor's office efficiently and effectively within the policy limits established by the legislature.").

created by the Legislature that is "under the direction and supervision of the state superintendent of public instruction."[11] Wis. Stat. § 15.37. The SPI is an "officer in the state government" who is not the governor, a district attorney, or a military and judicial officer; thus, the SPI is also considered an "agency" to which Wis. Stat. ch. 227 applies.

¶18 In order to implement the policy decisions of the Legislature, the Legislature delegates to agencies, by statute, the power to promulgate administrative rules.[12] In 1943, the

---

[11] The DPI is the administrative agency that interprets, implements, administers, and enforces the statutes in Wis. Stat. chs. 115-121 governing the supervision of public instruction at the state level. See Wis. Stat. § 115.001(2); see also Wis. Admin. Code PI (2013-14). The DPI is created by the Legislature and is "under the direction and supervision of the state superintendent of public instruction" Wis. Stat. § 15.37, and it is the agency that promulgates rules when it or the SPI are required to do so. For example, Wis. Stat. § 115.28(5) requires the SPI to promulgate rules establishing procedures for bringing appeals before the SPI, but the rule itself is drafted and promulgated by the DPI. See Wis. Admin. Code PI 1; CR 87-84, 384B Wis. Admin. Reg. (Dec. 31, 1987). The SPI is the "individual or body with policy making powers" who must approve rules proposed by the DPI.

[12] Wis. Stat. § 227.11(2)(a) (an agency may promulgate rules to effectuate the purpose of any statute administered by it); see also, e.g., Wis. Stat. § 85.16 (giving the Secretary of Transportation the authority to make rules "deemed necessary to the discharge of the powers, duties and functions vested in the department [of transportation]").

(continued)

Legislature created Wis. Stat. ch. 227, entitled "Administrative Procedure and Review."[13] The Legislature sought to promote efficiency and create a uniform set of procedures administrative agencies were to follow when promulgating rules. Chapter 227 of the Wisconsin Statutes has henceforth prescribed the procedure agencies must follow to promulgate valid rules and regulations. See, e.g., Wis. Stat. §§ 227.01(1)-.08 (1943-44); Wis. Stat. §§ 227.01(1)-.30 (2013-14).

¶19 A "rule" is defined by Wis. Stat. § 227.01(13) as "a regulation, standard, statement of policy or general order of general application which has the effect of law and which is issued by an agency to implement, interpret, or make specific legislation enforced or administered by the agency or to govern

---

The Legislature also frequently requires an agency to promulgate a rule on a certain subject. See generally Wis. Stat. § 41.11(1g)(b)(5) (requiring the Department of Tourism to "establish by rule" a reporting and verification requirement for recipients of grants or loans under state economic development programs); Wis. Stat. § 118.045 (requiring the Department of Public Instruction to promulgate rules to implement and administer the statute section regarding commencement of the school term); Wis. Stat. § 150.03 (requiring the Department of Health Services to adopt rules and set standards to administer subchapters I and II of Wis. Stat. ch. 150).

[13] See Ralph M. Hoyt, *The Wisconsin Administrative Procedure Act*, 1944 Wis. L. Rev. 214 (1944).

the organization or procedure of the agency."[14] Agencies generally _must_ promulgate rules to take any action pursuant to the statutes they are tasked with administering unless the statute explicitly contains the threshold, standard, or requirement to be enforced.[15] All agencies are _required_ to

---

[14] The statute gives a long list of agency actions or inactions that are not considered rules even though they would otherwise fit the definition given, such as actions concerning the internal management of an agency that do not affect private rights or interests, decisions or orders in contested cases, actions which relate to military or naval affairs, etc. See Wis. Stat. § 227.01(13)(a)-(zz).

[15] Agencies generally cannot take any legally binding action pursuant to a statute without promulgating a rule. For example, the COP-W/CIP-II program allows individuals who would qualify for Medicaid institutional care to instead receive services at home. The Department of Health and Family Services (DHFS) (now Department of Health Services) is tasked with administering this statute. Wis. Stat. § 49.43(3e), .45(1). Wis. Stat. § 49.45(6m)(i) states that this benefit is only available for persons receiving skilled, intermediate, or limited levels of nursing care as defined by the DHFS. In 2005, DHFS gave a written instruction to county "screeners" that changed how the screeners assessed whether someone qualified for "limited" care, but did not promulgate a rule to implement the new definition of needing limited care. Cholvin v. DHFS, 2008 WI App 127, ¶13, 313 Wis. 2d 749, 758 N.W.2d 118. Previously, screeners were to assess people based upon their needs on a "bad day." Id., ¶19. The new instruction required screeners to assess a person as fully functional unless they needed assistance one-third of the time or more. Id. The court of appeals determined that the instruction was invalid and had to be promulgated as a rule. The court found that the instruction "interprets law because it removes from consideration a number of possible functional limitations" and that it created a new standard because it imposed "an entirely new eligibility condition established by DHFS." Id., ¶¶32-33. Thus, pursuant to Wis. Stat. § 227.10(1) and .10(2m), DHFS screeners could not use the instruction to determine whether someone qualified for limited care until it validly promulgated the instruction as a rule.

promulgate rules to adopt general policies and interpretations of statutes that will govern the agency's enforcement or administration of that statute. Wis. Stat. § 227.10(1).[16] Additionally, an agency <u>may not</u> "implement or enforce any standard, requirement, or threshold, including as a term or condition of any license issued by the agency, unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a rule that has been promulgated in accordance with [Wis. Stat. ch. 227, subchapter II] . . . ." Wis. Stat. § 227.10(2m).

### 1. Agency Rulemaking Prior to Act 21[17]

¶20 Prior to Act 21, the procedures that agencies were required to follow to promulgate a rule were as follows. Once an agency resolved to make a rule, the agency began the rulemaking process by preparing "a statement of the scope" of the rule. Wis. Stat. § 227.135(1). Among other things, the scope statement gives an overview of the proposed rule and the effect it is likely to have on entities and government resources. Wis. Stat. § 227.135(1)(a)-(f).

---

[16] "Each agency shall promulgate as a rule each statement of general policy and each interpretation of a statute which it specifically adopts to govern its enforcement or administration of that statute." Wis. Stat. § 227.10(1).

[17] Again, we do not endeavor to recite every step of the process in detail, and there are many more requirements that must be met for a rule to be properly promulgated. <u>See</u> Wis. Stat. ch. 227 sub. II.

14

¶21 Once prepared, the agency sent a copy of the scope statement to the Legislative Reference Bureau for publication in the Administrative Register, and it sent another copy to the Secretary of Administration. Wis. Stat. § 227.135(3) (2009-10). The "individual or body with policy-making powers over the subject matter of a proposed rule" then had to approve the scope statement. Wis. Stat. § 227.135(2)(2009-10).

¶22 After approval by the individual or body with policy-making powers, the agency could begin drafting the proposed rule. See Wis. Stat. §§ 227.135(2)-.18 (2009-10). Once the drafting process was complete, the agency submitted the draft rule in its final form along with a detailed report about the proposed rule to the Legislature for review.[18] Wis. Stat. § 227.19(2)-(7)(2009-10).

### 2. Rulemaking After Act 21

¶23 As relevant here, Act 21 significantly altered the rulemaking process by allowing the Governor, at his discretion, to halt the process at two key points: (1) after the agency has prepared a scope statement and (2) before the agency submits a draft rule to the Legislature for review.[19] See Wis. Stat.

---

[18] The legislative review process is elaborate and complicated, and again we are merely giving a summary and not a comprehensive analysis of the process. The full legislative review process can be found in Wis. Stat. §§ 227.19-.265.

[19] As noted previously, in some circumstances Wis. Stat. § 227.137(6) as amended by Act 21 also allows the Secretary of Administration to keep a draft rule from being reviewed by the Legislature.

§ 227.135(2); Wis. Stat. § 227.185. At either juncture——and regardless of the approval of the "individual or body with policy-making powers over the subject matter of a proposed rule"——the agency may not proceed with the rulemaking process unless the agency receives the Governor's written approval, which can be withheld for any reason or for no reason. Id.

## B. Constitutional Challenges to Statutes

¶24 Coyne challenges the constitutionality of the aforementioned changes to Wis. Stat. ch. 227. Generally, there are two types of constitutional challenges to statutes: facial and as applied. Tammy W-G v. Jacob T., 2011 WI 30, ¶46, 333 Wis. 2d 273, 797 N.W.2d 854. In either case, the statute is presumed constitutional. See id., ¶¶46-48. A facial challenge "attacks the law itself as drafted by the legislature, claiming the law is void from its beginning to the end and that it cannot be constitutionally enforced under any circumstances." Soc'y Ins. v. LIRC, 2010 WI 68, ¶26, 326 Wis. 2d 444, 786 N.W.2d 385.

¶25 In an as applied challenge, the party does not attack the statute itself as unconstitutional; rather, the party claims that the statute has been applied to him or her in an unconstitutional manner. Id., ¶48. "The analysis of an as-applied challenge is determined by the constitutional right that is alleged to have been affected by the application of the

16

statute."[20] Tammy W-G, 333 Wis. 2d 273, ¶49. Accordingly, in an as applied challenge, the court "assess[es] the merits of the particular case in front of us, 'not hypothetical facts in other situations.'" State v. Wood, 2010 WI 17, ¶13, 323 Wis. 2d 321, 780 N.W.2d 63 (quoting State v. Hamdan, 2003 WI 113, ¶43, 264 Wis. 2d 433, 665 N.W.2d 785).

¶26 The line between facial and as applied challenges is not always clear. Here, for example, Coyne's argument contains elements of both a facial and an as applied challenge. See League of Women Voters of Wis. Educ. Network, Inc. v. Walker, 2014 WI 97, ¶134 n.40, 357 Wis. 2d 360, 851 N.W.2d 302 (Abrahamson, C.J., dissenting). Coyne is attacking the law as it was drafted by the Legislature, claiming that the portion of Act 21 involving the process of drafting and promulgating administrative rules could never be constitutionally applied. But Coyne limits this claim as applying only to the SPI. We conclude that this is an as applied challenge to Act 21 because Coyne is not claiming that the entirety of Act 21 can never be applied in any circumstance to any agency, but rather that Act 21 cannot be constitutionally applied to the SPI. See Soc'y Ins., 326 Wis. 2d 444, ¶26.

---

[20] Stated otherwise, the analysis changes depending on the right at issue. For example, when the challenge to the application of the statute involves an issue of freedom of conscience based on religious beliefs, we apply the "compelling state interest/least restrictive alternative test." See Tammy W-G v. Jacob T., 2011 WI 30, ¶50, 333 Wis. 2d 273, 797 N.W.2d 854.

17

¶27 The dissents take issue with the procedural posture of this case, specifically commenting that "no proof has been submitted that either Wis. Stat. § 227.135(2) or Wis. Stat. § 227.185 has been unconstitutionally enforced against the Superintendent." Chief Justice Roggensack's dissent, ¶231; see also Justice Ziegler's dissent, ¶¶250-52. Contrary to the dissents' positions otherwise, Act 21 does not have to have been enforced for Coyne to properly bring a claim via a declaratory judgment action. Coyne properly seeks——through a declaratory judgment——that the court determine her "rights, status, and other legal relations" in a justiciable controversy. Wis. Stat. § 806.04(1).

¶28 The Uniform Declaratory Judgments Act, Wis. Stat. § 806.04, allows "controversies of a justiciable nature to be brought before the courts for settlement and determination prior to the time that a wrong has been threatened or committed." Olson v. Town of Cottage Grove, 2008 WI 51, ¶28, 309 Wis. 2d 365, 749 N.W.2d 211. We have explained,

> A controversy is justiciable when the following four factors are present: (1) A controversy in which a claim of right is asserted against one who has an interest in contesting it. (2) The controversy must be between persons whose interests are adverse. (3) The party seeking declaratory relief must have a legal interest in the controversy——that is to say, a legally protectable interest. (4) The issue involved in the controversy must be ripe for judicial determination.

Id., ¶29. Governor Walker and Secretary Huebsch contested only the third factor in the courts below. They claimed that Coyne lacked a legally protectable interest in this controversy and

18

thus had no standing to bring this action. See Coyne, 361 Wis. 2d 225, ¶4. The court of appeals found that the Coyne parties had standing as taxpayers, id., ¶13, and Walker did not appeal that finding to this court.[21]

¶29 Justice Ziegler's assertion that this case is unripe for adjudication is also without merit due to the nature of a declaratory judgment action. See Justice Ziegler's dissent, ¶¶250-52. We examined the issue of ripeness in the context of the Declaratory Judgment Act in Olson, where we stated,

> By definition, the ripeness required in declaratory judgment actions is different from the ripeness required in other actions. . . . potential defendants 'may seek a construction of a statute or a test of its constitutional validity without subjecting themselves to forfeitures or prosecution.' Thus, a plaintiff seeking a declaratory judgment need not actually suffer an injury before availing himself of the Act. What is required is that the facts be sufficiently developed to allow a conclusive adjudication.

309 Wis. 2d 365, ¶43 (internal citations omitted). The facts before this court are sufficiently developed to determine whether Act 21 violates the constitution with respect the SPI. There are no details of any proposed rule or other facts that could come to light in the drafting process that would have any bearing on whether the contested portions of Act 21 violate

---

[21] "Unlike the federal courts, which can only hear 'cases' or 'controversies,' standing in Wisconsin is not a matter of jurisdiction, but of sound judicial policy." McConkey v. Van Hollen, 2010 WI 57, ¶15, 326 Wis. 2d 1, 783 N.W.2d 855. Accordingly, we are not required to reexamine this issue before proceeding.

Article X, § 1. The germane facts, namely, the constitutional provision and the text of the statutes, are already before us.

¶30 Consequently, this case is properly before us as an as applied challenge to the constitutionality of Act 21. See Waushara Cty. v. Graff, 166 Wis. 2d 442, 451, 480 N.W.2d 16 (1992) ("Appellate courts need not and ordinarily will not consider or decide issues which are not specifically raised on appeal."). Coyne is, however, claiming that the statute as written can never be constitutionally applied to the SPI. Thus, the burden of proof Coyne must meet is that the application of Act 21 to the SPI is unconstitutional beyond a reasonable doubt. Soc'y Ins., 326 Wis. 2d 444, ¶27.

C. Rulemaking, Supervision, and the Language of Article X

1. Rulemaking Is A Supervisory Power.

¶31 We first address whether rulemaking is a supervisory power of the SPI and DPI. Article X, § 1 states, "[t]he supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law." The SPI's and DPI's powers and duties are "prescribed by" the Legislature and found throughout Wis. Stat. chs. 115–121. If rulemaking is not a supervisory power, then there is no constitutional impediment to

Act 21 because it would not affect the supervision of public instruction.[22]

¶32 Coyne argues that because rulemaking has been part of the SPI's supervisory power since statehood, it is an "essential aspect" of the SPI's constitutional duty to supervise public instruction. In contrast, the Governor claims that rulemaking cannot be a supervisory power because of its "legislative nature." We find neither argument persuasive. Because the SPI is vested with the "supervision of public instruction," a "supervisory power" is one without which the SPI could not carry out his legislatively-mandated duties of supervision of public instruction. Put simply, the real question is whether the Legislature requires the SPI and DPI to supervise public instruction through rulemaking.

¶33 As agencies, the SPI and DPI are both bound by Wis. Stat. ch. 227. This means they are statutorily required by the Legislature to engage in rulemaking in order to "implement or enforce any standard, requirement, or threshold, including as a term or condition of any license issued by the agency." Wis. Stat. § 227.10(2m). The SPI and DPI cannot take any legally binding action pursuant to any of the statutes they are tasked

---

[22] "Public instruction" has been interpreted as "the elementary and high schools supported by pubic taxation." Wis. Stat. § 115.01(1). The SPI is tasked with the supervision of the public schools grades K-12, and the supervision of programs for the public schools that are supported by public taxation. See, e.g., Wis. 115.28 (1), (3), (20)-(23).

21

with administering without making rules unless the statute specifically provides for another course of action. Id. Because rulemaking is the only means by which the SPI and the DPI can currently perform most of their legislatively-mandated duties of supervision of public instruction,[23] rulemaking is a supervisory power that the DPI and SPI must use to supervise public instruction.

¶34 Article X, § 1 states, "[t]he supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law." Though we have never interpreted the phrase "shall be prescribed by law" in specific reference to Article X, "[t]his court has consistently stated that the phrase 'prescribed by law' in art. VI, § 3 plainly means prescribed by statutory law." State v. City of Oak Creek, 2000 WI 9, ¶19, 232 Wis. 2d 612, 605 N.W.2d 526. Neither reason nor precedent leads us to interpret this same phrase differently in this provision.

¶35 The Legislature has "prescribed by law" the SPI's and DPI's duties and powers of supervision of public instruction in Wis. Stat. chs. 115-121. By enacting Wis. Stat. § 15.37, the Legislature has "prescribed by law" that the SPI oversee the DPI. It has also "prescribed by law" that the SPI and DPI are agencies bound by Wis. Stat. ch. 227. See Wis. Stat.

---

[23] See Wis. Stat. chs. 115-121; see also Part D., infra; n.35, infra.

§ 227.01(1). Further, the Legislature has "prescribed by law" that the SPI and DPI must engage in rulemaking. See, e.g., infra n.39; Wis. Stat. §§ 227.10. Thus, rulemaking is a supervisory power because it is the means by which the Legislature has prescribed the SPI and DPI to carry out the majority of their statutorily-mandated duties and powers. Stated otherwise, rulemaking is the means by which the Legislature has "prescribed by law" that the SPI must carry out his Legislatively-defined duties of supervision.

¶36 To be clear, rulemaking is not a constitutional power of the SPI. Article X, § 1 "is not [a provision] which incorporates an ancient common law office [such as the sheriff], possessing defined powers and duties, into the constitution." Fortney v. Sch. Dist. of W. Salem, 108 Wis. 2d 167, 182, 321 N.W.2d 225 (1982). There were no common law duties and powers that the SPI or any other officers of supervision of public instruction had traditionally possessed prior to the adoption of the Wisconsin Constitution because neither the office of the SPI nor a uniform system of public instruction existed prior the adoption of our constitution in 1848. See id.

¶37 Consequently, any rulemaking power the SPI and DPI has is clearly a delegation of power from the Legislature, not from the constitution. However, under the current statutory prescription, the SPI and DPI cannot carry out their duties and powers of supervision without rulemaking. See Wis. Stat. § 227.10; see also infra n.39. Accordingly, under the current Legislative prescription of the SPI's powers and duties of

23

supervision of public instruction, rulemaking is a supervisory power.

### 2. The Legislature May Delegate Supervision of Public Instruction Only to Officers of Supervision of Public Instruction.

¶38 We next address the argument that even if rulemaking is a supervisory power, the Legislature is free to divide that power among any "other officers" it chooses pursuant to Article X, § 1 of the Wisconsin Constitution. Both parties spent a substantial amount of effort arguing about the applicability and validity of our decision in Thompson, in which we held that the Legislature must maintain the superiority of the SPI over the "other officers" in whom supervision of public instruction is vested. 199 Wis. 2d 674. Thus, we begin with a discussion of Thompson.

### a. Thompson v. Craney

¶39 Thompson's examination of Article X, § 1 is instructive to our analysis here, and much of what was said there applies to this case because we are interpreting the same constitutional provision under similar circumstances. However, this case poses a different constitutional question than the question posed in Thompson. In Thompson, the Legislature had redistributed nearly all of the SPI's powers of supervision of public instruction among other officers whose roles all related to the supervision of public instruction: a new Department of Education, a new Education Commission, and a new Secretary of Education. Id. at 678-79 (emphasis added). There, the question

was not whether those officers could constitutionally be vested with the supervision of public instruction at all, but rather, whether the constitution allowed such "other officers" of supervision of public instruction to be given equal or greater authority over the supervision of public instruction than the SPI. Id.

¶40 In contrast, here, the Legislature is attempting to give officers who are not officers of supervision of public instruction the ability to prevent the SPI from promulgating rules. Thus, the question in this case is whether the term "other officers" in Article X, § 1 allows some supervision of public instruction to be vested in any other officers the Legislature chooses, including other constitutional officers whose offices were not created to supervise public instruction.

¶41 In short, there are two questions a court must consider. The first is whether the Legislature vested the supervision of public instruction in a proper "other officer." If the Legislature did not, then the analysis ends. If the Legislature did, then, under Thompson, we proceed to consider whether that "other officer" has been given equal or greater authority over the supervision of public instruction than the SPI. The Thompson court only addressed the second question, but we must address the first. Thus, although much of Thompson's general discussion of Article X, § 1 applies to this case, Thompson does not answer the precise constitutional question before us. Accordingly, we proceed to consider the first question left unanswered by Thompson: whether the Legislature

25

vested the supervision of public instruction in a proper "other officer."

### b. General Principles Governing the Interpretation of a Constitutional Provision

¶42 "The surest guides to a proper interpretation of [Article X, § 1] are the constitutions of 1846 and 1848, the 1902 amendment, the accompanying debates, our legislature's first laws following adoption, and this court's prior interpretation of Article X, § 1." Thompson, 199 Wis. 2d at 698. Applying this approach, we begin by looking at the language of Article X, § 1 when it was adopted in 1848 and when it was amended in 1902. See Polk Cty., 188 Wis. 2d at 674. First adopted in 1848, Article X, § 1 stated,

> The supervision of public instruction shall be vested in a state superintendent, and such other officers as the legislature shall direct. The state superintendent shall be chosen by the qualified electors of the state, in such manner as the legislature shall provide; his powers, duties, and compensation shall be prescribed by law. Provided, that his compensation shall not exceed the sum of twelve hundred dollars annually.

In 1902, Article X, § 1 was amended to read,

> The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law. The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold office for four years from the succeeding first Monday in July. The state superintendent chosen at the general election in November, 1902, shall hold and continue in his office until the first Monday in July, 1905, and his

26

successor shall be chosen at the time of the judicial election in April, 1905. The term of office, time and manner of electing or appointing all other officers of supervision of public instruction shall be fixed by law.

Small, non-substantive changes were made by amendment in 1982; these changes included removing the word "his" from before the word "office," changing the word "four" to "4," and removing the sentence about the 1902 and 1905 elections.

¶43 "The purpose of construing a constitutional amendment 'is to give effect to the intent of the framers and of the voters who adopted it.'" Appling v. Walker, 2014 WI 96, ¶19, 358 Wis. 2d 132, 853 N.W.2d 888 (citing State v. Cole, 2003 WI 112, ¶10, 264 Wis. 2d 520, 665 N.W.2d 328). "To determine what the framers and the voters wanted the constitutional provision to accomplish we first look at the plain language and meaning of the amendment they ratified." Appling, 358 Wis. 2d 132, ¶22. It is a paramount rule of constitutional construction that the intent of a provision "is to be ascertain[ed], not alone by considering the words of any part of the instrument, but by ascertaining the general purpose of the whole[.]" Kayden Indus., Inc. v. Murphy, 34 Wis.2d 718, 730, 150 N.W.2d 447 (1967) (quoting State ex rel. Ekern v. Zimmerman, 187 Wis. 180, 184, 204 N.W. 803, 805 (1925)).

¶44 When we examine the constitution as a whole, we conclude that Article X, § 1's reference to "other officers" means officers of supervision of public instruction other than the SPI. Article X is titled "Education," and the eight sections that lay within Article X form the foundation of Wisconsin's

27

public education system. It follows then that the most logical interpretation of Article X, § 1 is that "other officers" means "other officers" whose offices relate to supervising education, i.e., other officers of supervision of public instruction.

c. The Plain Language Of Article X, Section 1.

¶45 The structure and language of Section 1 itself supports our interpretation as well. When the plain language of Article X, § 1 is read within the context of the entire section, it becomes clear that the "other officers" in whom the Legislature may vest the supervision of public instruction are other officers of supervision of public instruction.

¶46 When the same word or phrase appears twice in the same statute or provision, we attribute the same definition to that word or phrase. See DaimlerChrysler v. LIRC, 2007 WI 15, ¶29, 299 Wis. 2d 1, 727 N.W.2d 311 ("It is a basic rule of construction that we attribute the same definition to a word both times it is used in the same statute or administrative rule."). The only officers mentioned in Section 1 are the superintendent and the "other officers." The second sentence of Section 1 refers only to the superintendent.[24] The final sentence of Article X, § 1 refers to "all other officers of supervision of public instruction." (Emphasis added.) Thus, the most

---

[24] "The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold office for 4 years from the succeeding first Monday in July." Wis. Const. Art. X, sec. 1.

28

reasonable construction of Section 1——as a whole——is that the term "all other officers" in the last sentence of Section 1 is referring to "all officers authorized by Article X, § 1 other than the superintendent." The final sentence specifically states that these "other officers" are "other officers of supervision of public instruction." It would defy our basic principles of construction to conclude that the drafters of Article X, § 1 were referring to different "other officers" in the first sentence than in the last, particularly when read in context with the rest of Section 1. See, e.g., State v. Cole, 2003 WI 112, ¶13, 264 Wis. 2d 520, 665 N.W.2d 328 ("In interpreting a constitutional provision, we first turn to the plain meaning of the amendment in context").

¶47 Further evidence that the "other officers" referred to in Article X, § 1 were intended exclusively to be other officers of supervision of public instruction is found throughout Section 1. The Legislature is empowered to define the qualifications, powers, duties, compensation, term of office, and time and manner of selection of all "other officers" authorized by Article X. The very existence of their offices is dependent upon the Legislature. With this in mind, the most straightforward interpretation of "such other officers as the Legislature may direct" is that the "other officers" are meant to be "creatures of the Legislature" whose offices were created to supervise public instruction. See, e.g., City of Sun Prairie v. Davis, 226 Wis. 2d 738, ¶¶29-31, 595 N.W.2d 635 (1999) (nothing that although municipal courts are authorized by the

29

constitution, they exist only if the Legislature creates them; thus, they are "creatures of the legislature" with no inherent powers).

¶48 Another indication that the "other officers" in Article X, § 1 must be other officers of supervision of public instruction is found in the provision for a state superintendent. See Thompson, 199 Wis. 2d at 698-99. The first portion of Article X, § 1 vests supervision of public instruction in "a state superintendent and such other officers as the legislature may direct." The constitution does not define "superintendent," so we look to a dictionary from around the time of the provision's adoption to determine the common, ordinary meaning of the word at the time of the adoption of the constitution. See Xcel Energy Servs., Inc. v. LIRC, 2003 WI 64, ¶32, 349 Wis. 2d 234, 833 N.W.2d 665. A superintendent is "[o]ne who has the oversight and charge of something, with the power of direction."[25]

¶49 The Legislature must vest the supervision of public instruction in officers over whom the SPI has "oversight and charge with the power of direction," or by definition he is no

---

[25] Superintendent, Noah Webster, An American Dictionary of the English Language, 810 (J.E. Worcester ed., New York, N. & J. White, 15th abr. ed. 1838).

longer the superintendent of public instruction.[26] See Thompson, 199 Wis.2d at 698-99. Article X, § 1 gives the Legislature the freedom to shape and reshape a system of public education that fits the needs of the people of our State at any given time. See id., see also Thompson, 199 Wis. 2d at 701-02 (Wilcox, J., concurring). To that end, the Legislature is free to create or eliminate the positions of whatever "other officers" of supervision of public instruction it wants. The Legislature may also grant, withhold, or take away those officers' powers and duties as it sees fit. However, supervision of public instruction must remain in the hands of officers whose activities the SPI oversees and directs; otherwise, the SPI is no longer supervising public instruction, which would constitute a violation of Article X, § 1. See Thompson, 199 Wis. 2d at 698-99.

¶50 The argument remains, however, that "other officers" and "other officers of supervision of public instruction" are different terms, and thus "other officers" in the first sentence must have a different meaning than "other officers" in the last

----

[26] This does not mean that the SPI must have direct control over every decision made by the other officers of supervision of public instruction. See, e.g., Wis. Stat. § 118.01(1) (outlining the responsibilities of the superintendent, the school boards, the parents and guardians of pupils, and the state in public education). Rather, the SPI has the "power of direction" of the other officers of supervision of public instruction if those officers are not free to ignore the directives of the SPI made pursuant to the statutes he is tasked with administering by the Legislature. Compare Wis. Stat. ch. 115 with Wis. Stat. ch. 118.

sentence. We cannot conclude that the plain language of Article X, § 1 unambiguously precludes this interpretation, so we move on to our second source of constitutional interpretation: the constitutional debates and practices in existence at the time of the writing of the constitutional provision. Polk Cty., 188 Wis. 2d at 674.

d. The Constitutional Debates Regarding Article X.

¶51 When interpreting a constitutional provision we do not rest our analysis on the language of the provision alone. Rather, we also consult the constitutional debates and the practices in existence at the time of the writing of the constitutional provision and the interpretation of the provision by the Legislature as manifested in the laws passed following its adoption. Id. Both the constitutional debates and the laws passed following the adoption of Article X, § 1 and the 1902 amendment show that the "other officers" authorized by the provision were meant to be officers of supervision of public instruction whose positions were created by the Legislature exclusively for that purpose.

¶52 As originally proposed in 1846, Article X, § 1 read:

> The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature may direct. The state superintendent shall be chosen by the electors of the state once in every two years. The legislature shall provide for filling vacancies in the office of state superintendent and prescribe his powers and duties.

The Convention of 1846, 538 (Milo M. Quaife, ed., 1919) available at

https://books.google.com/books?id=EY0UAAAAYAAJ&printsec=titlepage&source=gbs_summary_r&hl=en#v=onepage&q&f=false (hereinafter The Convention of 1846). The proposed constitution of 1846 was not adopted, and another convention was called in 1847. The Attainment of Statehood, VI-VIII, (Milo M. Quaife, ed. 1928). The wording of the 1846 provision was largely retained; the only changes made were regarding the method of selection of the superintendent. See Thompson, 199 Wis. 2d at 686.

¶53 As this court recognized in Thompson, discussion of the role or powers of the "other officers" mentioned in Article X is completely absent from the constitutional debates of 1846 and 1848. 199 Wis. 2d at 687; see also Conrad Patzer, Public Education in Wisconsin 17-27 (1925); Journal and Debates, reprinted in The Attainment of Statehood, (Milo M. Quaife, ed., 1928). The debates focused mainly on the other sections of the Article and the importance of the superintendent. The phrase "such other officers as the legislature shall direct" went virtually unchallenged. Thompson, 199 Wis. 2d at 687.

¶54 However, two defeated proposals regarding the superintendent from the 1846 debates indicate that the framers envisioned the "other officers" in Article X, § 1 to be officers of public instruction whose offices were created by the Legislature. One delegate to the 1846 convention sought to amend Section 1 by eliminating the superintendent altogether. His proposed amendment read "[t]he supervision of public instruction shall be vested in such officers as shall hereafter be created by law." The Convention of 1846, 568. Another delegate thought

that the superintendent was unnecessary and that "the duties [of supervision of public instruction] for a time might be done by the secretary of state or some other officer already provided for, leaving to the legislature to provide for this office when the time came." Id.

¶55 The framers of the 1846 constitution rejected a model where the supervision of public instruction was vested in "other officer[s] already provided for," and all other proposed amendments to the section always left it to the Legislature to provide for new officers to supervise public instruction. The framers decided that a superintendent was crucial and rejected both proposals, but clearly they were considering a system where the supervision of public instruction was vested in a superintendent and officers whose offices were created for that purpose. That the "other officers" were intended to be officers of supervision of public instruction was never in contention.

¶56 Moreover, the history of the 1902 amendment to Article X, § 1 indicates that the drafter of the amendment and those who ratified it also understood the "other officers" to be other officers of supervision of public instruction. The 1902 amendment, which substantially provided Article X, § 1 as we know it today, was drafted and supported by then-Superintendent of Public Instruction Lorenzo Dow Harvey. See Conrad Patzer, Lorenzo Dow Harvey, 93 (1936). Harvey was concerned that local, elected county superintendents had been using the office for political gain rather than for furthering the cause of education, so he introduced the amendment in order to allow the

34

Legislature to provide for the appointment of local public instruction officials. See id. at 93; see also Thompson, 199 Wis. 2d at 691-92. Additionally, Harvey was concerned with ensuring that there was enough flexibility to overhaul the public school system, as Justice Wilcox pointed out in his concurrence in Thompson. 199 Wis. 2d at 702-03 (Wilcox, J., concurring).

¶57 Our review of the history of the drafting of the 1902 amendment reveals that like the drafters of the original provision, Harvey only ever contemplated the Legislature vesting the supervision of public instruction in officers whose offices were created by the Legislature for that purpose. See Thompson, 199 Wis. 2d at 690-693; see also Thompson, 199 Wis. Stat. § at 701-05 (Wilcox, J., concurring); Conrad Patzer, Lorenzo Dow Harvey, 93-95. Harvey's stated purpose of amendment was to allow the Legislature to appoint public instruction officers, if necessary, in order to ensure that the officers supervising public instruction were dedicated solely to the task of education rather than using the office as a political stepping stone. In fact, it was Harvey who added the "other officers of supervision of public instruction" language to the section. It strains credulity to accept that Harvey intended Article X, § 1 to allow the Legislature to vest the supervision of public instruction in officials who are not officers of supervision of public instruction when he is the person who added that language to Section 1.

e. The First Laws Interpreting Article X, Section 1.

35

¶58 We next turn to our third source of interpreting a constitutional provision. We examine the "earliest interpretation of the provision by the legislature as manifested in the earliest law passed following the adoption of the constitution." Polk Cty., 188 Wis. 2d at 674. Thus, we look to the first laws passed vesting the supervision of public instruction in "other officers." The constitution does not define "supervision," so we again look to a dictionary from around the time of the provision's adoption to determine the common, ordinary meaning of the word "supervision" at the time of the adoption of the constitution.[27] See Xcel Energy Servs., Inc., 349 Wis. 2d 234, ¶32. "Supervision" is defined as "[t]he act of overseeing; inspection; superintendence."[28]

¶59 The first laws regarding "overseeing, inspection, or superintendence" of public instruction passed by the Legislature of 1848 defined the powers and duties of the SPI and created the office of "town superintendent of common schools." See Laws of

---

[27] The term "supervision" was not changed by the 1902 amendment, so we use a dictionary from around the time Article X, § 1 was initially adopted. Additionally, the definition has not changed substantially since 1848. "Supervision" is defined as "[t]he series of acts involved in managing, directing, or overseeing persons or projects"; Supervision, Black's Law Dictionary (10th ed. 2014).

[28] Supervision, Noah Webster, An American Dictionary of the English Language, 811 (J.E. Worcester ed., New York, N. & J. White, 15th abr. ed. 1838).

1848, 127-29;[29] Laws of 1848, 209. The duties of the town superintendent of common schools included qualifying teachers, examining the condition of schools, and advising on the course of studies to be pursued. See Laws of 1848, 219, Sec.1-2. The town superintendent of common schools was "in all cases under the control and direction of the state superintendent of public instruction." Laws of 1848, 219, Sec.3.

¶60 The Legislature also enacted an "Act in relation to Public Schools," which created the school district system, school district officers, district boards, and town boards of school inspectors. Laws of 1848, 226-47. The SPI, the town superintendent, and the district officers and boards were entrusted with all functions of the public schools. Id. All of these officers whom the Act vested with the supervision of public instruction are, aside from the SPI, officers whose positions the Legislature created for the purpose of supervising public instruction.[30] See Laws of 1848, 127-29, 226-47. The Legislature created county superintendents of schools in 1866. See, e.g., Laws of 1866, Chapter 111. Some Legislatures created city boards of education and city superintendents to supervise public instruction in the cities; these officers wielded the

---

[29] The laws of 1848 did not provide separate numbers for each act. Thus, we will cite to these laws by the page on which it appears in the bound volume of the Laws and the section number where appropriate.

[30] Some record-keeping responsibilities were given to the town clerk. See Laws of 1848, 226-47, Sec.80-88.

powers of supervision that would have otherwise been vested in the county superintendent. See, e.g., Laws of 1865, Chapter 268, 361-363 (creating a board of education to supervise public instruction in the city of Appleton). The common thread between these "other officers" is that they all are officers of public instruction whose offices the Legislature created for the purpose of supervising public education.

¶61 Similar to the Legislature's actions following the adoption of the 1848 constitution, the Legislature first interpreting the 1902 amendment to Article X, § 1 routinely and exclusively vested the supervision of public instruction in officers of supervision of public instruction. The Legislature provided the qualifications, powers, duties, and compensation of the SPI in the Laws of 1903, Chapter 37, 54. The Legislature reintroduced the office of the County Superintendent of Common Schools and the city superintendents were retained. Laws of 1903, Chapter 307, 480; see also Wis. Stat. ch. 27 sec. 461 (1911) (assigning duties of county superintendents that included licensing teachers, examining schools in his district, and advising on methods and courses of instruction). The Legislature established the township system of school government in the towns of Hiles and Laona. Laws of 1903, Chapter 36, 50. School boards in large cities were given the power to establish schools and hire support staff. Laws of 1903, Chapter 101, 150. In sum, the first laws passed after the 1902 amendment to Article X, § 1

reflect that Legislature's understanding that "other officers" meant other officers <u>of supervision of public instruction</u>.[31]

¶62 In fact, the Legislature's vesting of supervision of public instruction solely in officers of supervision of public instruction has continued in an unbroken line from the founding of our State in 1848 to the present. We were unable to find a <u>single instance</u> in which the Legislature of this State gave supervision of public instruction to officers whose office was not dedicated to supervising public education.[32] Even when the Legislature attempted to restructure the entire system of public instruction with the law at issue in <u>Thompson</u>, it created <u>new offices of supervision of public instruction</u> such as a Department of Education. <u>See</u> <u>Thompson</u>, 199 Wis. 2d at 678-79. To be clear, the Legislature has never attempted to vest the supervision of public instruction in "other officers" whose offices——like the Governor's——were not devoted to that task, and

---

[31] For a summary of the various ways the Legislature organized the school system between 1848 and 1924, see Patzer, <u>Public Education in Wisconsin</u> (1924).

[32] There were some instances where the Mayor of a city was designated as one of the members of the city board of education; however, the vesting of supervision was in the board, not in the mayor. <u>See, e.g.,</u> Laws of 1865, Chapter 268, 361-362 (Appleton city board of education to consist of the mayor, the director, and the clerk of each school district, with the city superintendent as an ex officio member).

that is how we have uniformly interpreted "such other officers as the legislature shall direct" as well.[33]

¶63 In sum, "[t]he surest guides to a proper interpretation of [Article X, § 1] are the constitutions of 1846 and 1848, the 1902 amendment, the accompanying debates, our legislature's first laws following adoption, and this court's prior interpretation of Article X, § 1." Thompson, 199 Wis. 2d at 698. Our review of these sources leads us to a single conclusion: that the "other officers" in whom the Legislature may vest the supervision of public instruction must be other officers of supervision of public instruction. It is self-evident that neither the office of the Governor nor that of the Secretary of Administration were created by the Legislature as officers of supervision of public instruction. Accordingly, the Legislature may not delegate to the Governor or the Secretary of

---

[33] See Raymer v. Cunningham, 82 Wis. 39, 48, 51 N.W. 1133 (1892) ("[Article X, § 1] expressly declares that 'the supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct.' This left the legislature free to prescribe such assistants and clerks as may be deemed essential." (emphasis added)); Thompson v. Craney, 199 Wis. 2d 674, 707, 546 N.W.2d 123 (1996) (Wilcox, J., concurring) ("The ability of the legislature to create other state officers who exercise supervisory authority over public instruction was addressed by this court in Burton v. State Appeal Bd. . . . [and the court held the board members were Article X officers rather than mere "employees"]." (emphasis added)); Fortney v. Sch. Dist. of W. Salem, 108 Wis. 2d 167, 182, 321 N.W.2d 225 (1982) ("Because the constitution explicitly authorized the legislature to set the powers and duties of the public instruction officers, Article X, § 1 confers no more authority upon those officers than that delineated by statute." (emphasis added)).

40

Administration the power to "oversee, inspect, or superintend" public instruction. To do so would result in the unconstitutional vesting of the supervision of public instruction in an officer who is not an officer of supervision public instruction.

    D. Act 21 And Supervision of Public Instruction.

¶64 Having determined that rulemaking is a supervisory power granted to the SPI and DPI by the Legislature and that the supervision of public instruction may not be vested in the Governor or the Secretary of Administration, the remaining question is whether Act 21 vests the Governor and the Secretary of Administration with the supervision of public instruction. Act 21 did not remove or reduce the rulemaking powers of the SPI or DPI. Accordingly, the issue here is whether the power to halt the rulemaking of the SPI and DPI vests the Governor and Secretary of Administration with the supervision of public instruction.

¶65 We hold that it does. By giving the Governor the power to prevent the SPI's and DPI's proposed rules from being sent to the Legislature, Act 21 gives the Governor the authority to "oversee, inspect, or superintend" public instruction. Indeed, Act 21 gives the Governor the power to decide upon the very existence of any rules on all topics regarding the supervision of public instruction. The Secretary of Administration holds this same power if the rule at issue meets the conditions set forth in Wis. Stat. § 227.137(6). Accordingly, Act 21 vests the

41

Governor and the Secretary of Administration with the supervision of public instruction.

¶66 As discussed previously, rulemaking is the primary means by which the SPI and DPI must carry out their legislatively-mandated duties. The SPI and DPI are statutorily required to promulgate rules in order to adopt any statement of general policy and any interpretation of a statute "to govern [their] enforcement or administration of that statute," as well as to "implement or enforce any standard, requirement, or threshold" unless the same is explicitly required or permitted by statute. Wis. Stat. § 227.10(1), (2m). Additionally, the "Education" chapters of the statutes, Wis. Stat. chs. 115-121, mandate no less than 71 times[34] that the SPI or DPI make rules on various subjects ranging from the licensing of teachers to the

---

[34] Within Wis. Stat. chs. 115-121, there are 53 instances where the statutes state that the SPI or the DPI "shall" promulgate rules, and 18 instances where the statutes state that a particular item will be administered "as defined [by the SPI or DPI] by rule." This does not include statutes that the SPI or DPI would have to promulgate a rule to administer or enforce due to the requirements of Wis. Stat. § 227.10.

commencement of the school term.[35] This number does not even include the statutes the SPI and DPI are tasked with administering that do not include a command to promulgate a rule. Under the current legislative prescription, the SPI and DPI cannot supervise public instruction without rulemaking. Pursuant to Act 21, they cannot promulgate rules without the approval of the Governor. Consequently, Act 21 beyond a reasonable doubt unconstitutionally vests the supervision of public instruction in the Governor.

¶67  The Governor contends that Act 21 does not vest the Governor with the supervision of public instruction because it does not transfer the power to make rules regarding public instruction to the Governor and Secretary of Administration, nor does it infringe upon the SPI's ability to approve or deny the DPI's scope statements. We disagree. The essence of supervision includes the power to prevent an action at one's discretion. While Act 21 does not give the Governor the power to promulgate

---

[35] See, e.g., Wis. Stat. § 115.28(7) (SPI must make rules establishing standards and procedures for licensing teachers); Wis. Stat. § 115.28(59)(d) (SPI must promulgate rules to provide academic and career planning to students); Wis. Stat. § 115.36(3)(a) (Department of Public Instruction must promulgate rules to fund school district projects assisting minors with drug or alcohol problems); Wis. Stat. § 115.415 (Department of Public Instruction must promulgate rules on evaluating teacher effectiveness); Wis. Stat. § 118.045(3) (Department of Public Instruction shall promulgate rules to determine whether a school board may commence the term before September 1); Wis. Stat. § 120.14 (Department of Public Instruction must establish by rule a standard contract and minimum standards for school board audits).

rules regarding public instruction, it does give the Governor the power "in his or her discretion"[36] to decide that "there will be no rule on a given subject irrespective of the judgment of the SPI." Coyne, 361 Wis. 2d 225, ¶29.

¶68 It is granting the Governor and Secretary of Administration the power to make the decision on whether the rulemaking process can proceed that causes the constitutional infirmity. This unchecked power to stop a rule also gives the Governor the ability to supplant the policy choices of the SPI. Like the court of appeals, we believe that "a Governor at loggerheads with an SPI over the content of a proposed rule, or a proposed rule change, could use the threat to withhold approval as a means of affecting the rule content." Id., ¶35. For example, the Governor could refuse to approve a scope statement or a rule until it met the Governor's specifications.

¶69 This does not mean the Governor and the Secretary of Administration cannot be involved in the rule-drafting process at all; it simply means that they cannot be given the authority to halt the process. The Legislature can require whatever rulemaking steps it wants as long as the SPI and DPI are able to make the final decision on the contents of a proposed rule and submit that proposed rule to the Legislature at the end of the process. For example, there is no constitutional infirmity in requiring the SPI and DPI to prepare the economic impact

---

[36] Wisconsin Stat. § 227.185.

analysis and submit it to the Secretary of Administration and the Governor as long as those officers are not permitted to block the rule from being submitted to the Legislature. Additionally, the Legislature could require the SPI to submit the draft rule to the Governor and allow the Governor to send the rule back to the SPI with requested changes (provided the SPI is not required to incorporate them). The Legislature could further require the SPI to hold additional hearings on the Governor's proposed changes, to prepare a detailed report on the Governor's proposed changes and a report on why the SPI does not agree with them, to have a personal consultation with the Governor, or to resubmit the rule to the Governor to get his written opinion on it and submit that opinion to the Legislature along with the draft rule. The Legislature can create whatever rulemaking process it sees fit, as long as at the end of the process the SPI and DPI are able to decide on the final content of a proposed rule and submit that proposed rule to the Legislature.[37]

¶70 Additionally, the constitution gives the Legislature control over what powers the SPI and the other officers of supervision of public instruction possess in order to supervise public instruction. As a result, the Legislature may give, may not give, and may take away the powers and duties of the SPI and the other officers of supervision of public instruction. If the

---

[37] This statement assumes that the Legislature continues to require the SPI and DPI to promulgate rules.

45

Legislature does not believe the SPI should engage in rulemaking, it is free to change the statutory scheme so that the SPI and DPI can carry out the duties with which they are tasked through other means and are not required to promulgate rules. Moreover, it could change the duties with which they are tasked, or it could provide all of the definitions, standards, requirements, thresholds, and terms or conditions of any licenses issued by the SPI and DPI by statute. What it cannot do is require the SPI and DPI to supervise public instruction through rulemaking and then condition rulemaking on the approval of an officer who is not an officer of supervision of public instruction.

¶71 Accordingly, the constitutional problem with Act 21 is that it contains no mechanism for the SPI and DPI to proceed with rulemaking in the face of withheld approval by the Governor or Secretary of Administration. Had the Legislature provided some means for the SPI and DPI to continue the rulemaking process if the Governor or the Secretary of Administration did not approve the rule, the supervision of public instruction would remain with the SPI and DPI. However, as currently written, Act 21 gives the Governor and Secretary of Administration the unchecked power to halt the SPI's and DPI's promulgation of rules on any aspect of public instruction, ranging from teachers' qualifications to the implementation of the school milk program to nonresident waiting list requirements

46

for pupils.[38] In other words, Act 21 improperly vests the Governor and Secretary of Administration with the supervision of public instruction in violation of Article X, § 1. Consequently, the portions of Act 21 allowing the Governor and Secretary of Administration to halt the rulemaking process are void as applied to the SPI and his subordinates.

### E. The Reasons the Dissents and the Lead Reach a Different Conclusion.

¶72 Now that we have fully presented our interpretation of Article X, § 1, we turn to discuss a few of the points made in Chief Justice Roggensack's and Justice Ziegler's dissents. We begin with a brief summary of our analysis. First, Article X, § 1 states that "the supervision of public instruction shall be vested in a state superintendent" and in "other officers of supervision of public instruction." Thus, the constitution grants the SPI the power to supervise public instruction. Second, Article X, § 1 states that the SPI's "qualifications, powers, duties, and compensation shall be prescribed by law." This means the Legislature has the power to fill in the details as to what supervision entails. The Legislature has required the SPI to supervise public instruction through rulemaking. Consequently, rulemaking is how the SPI exercises his power to supervise public instruction. Under Act 21, the Legislature has taken the SPI's power to supervise via

---

[38] See Wis. Stat. § 115.28(7); Wis. Stat. § 115.343(1); Wis. Stat. § 118.51(5)(d)3.

rulemaking and conditioned it on the approval of the Governor. The Governor is not an "officer of supervision or public instruction;" therefore, the Legislature cannot vest him with the supervision of public instruction.

¶73 The main problem with the dissents' analyses are their singular focus on only half of Article X, § 1. Both dissents emphasize the phrase "and their qualifications, powers, duties, and compensation shall be prescribed by law." However, a meaningful interpretation of Article X, § 1 should focus on two equally important phrases: (1) "The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct," and (2) "and their qualifications, powers, duties and compensation shall be prescribed by law."

¶74 While Article X, § 1 gives the Legislature the broad authority to both create "other officers of supervision of public instruction" and to outline those officer's "qualifications, powers, duties and compensation," Article X, § 1 also places some limits on the Legislature's power. Per the words of Article X, § 1, the "other officers" the Legislature creates must be "other officers of supervision of public instruction." Additionally, the plain language of Article X, § 1 demands that "[t]he supervision of public instruction [] be vested in a state superintendent and such other officers." Chief Justice Roggensack's and Justice Ziegler's dissents refuse to recognize these limitations.

48

¶75 First, neither Chief Justice Roggensack's dissent nor Justice Ziegler's dissent attempt to address the question at the heart of the controversy in this case: in whom may the Legislature vest the supervision of public instruction? Indeed, Chief Justice Roggensack remarks, "[t]he matter before us does not concern the 'other officers' mentioned in Article X, § 1." Chief Justice Roggensack's dissent, ¶227. And Justice Ziegler comments, "[I]t is not really the Governor who is supervising (or even obstructing, if one prefers) the actions of the SPI; it is the Legislature." Justice Ziegler's dissent, ¶247. Our response to both is simply this: how is it not? How does the matter before us not concern the "other officers" mentioned in Article X, § 1? And how is the Governor not supervising public instruction and the SPI when he is the one who halts the rulemaking process? If neither Chief Justice Roggensack nor Justice Ziegler will recognize that the constitution places a limit on who the Legislature may vest the supervision of public instruction in, then we can never reach the same conclusion despite agreeing on many legal principles.[39]

---

[39] The closest Chief Justice Roggensack's dissent comes to answering this question is its statement that "[t]he legislature has broad constitutional power over the Superintendent, so long as the tasks assigned do not fall outside public instruction, as it was alleged the statute did in School Dist. No. 3, supra." Chief Justice Roggensack's dissent, ¶225 (emphasis added). Thus, the dissent comments that the tasks assigned to the SPI must relate to public instruction. But it fails to consider whether the people to whom the tasks are assigned——the officers——must relate to public instruction. We are confident that had Chief Justice Roggensack undertaken her constitutional analysis with

(continued)

49

¶76 Second, neither dissent is willing to acknowledge the constitution's instruction that "[t]he supervision of public instruction [] be vested in a state superintendent and such other officers as the legislature shall direct." Both Chief Justice Roggensack's dissent and Justice Ziegler's dissent instead immediately proceed to focus exclusively on the Legislature and its ability to outline the SPI and the "other officers'" "qualifications, powers, duties and compensation." Because both dissents skip over the clause that vests supervision of public instruction in the SPI and "other officers," and instead only look at the "prescribed by law" clause, both dissents read our opinion as stripping the Legislature of its power under Article X, § 1. For example, Chief Justice Roggensack remarks that our opinion "reduces the constitutional power of the legislature to control its delegations of legislative power in rulemaking." Chief Justice Roggensack's dissent, ¶229. And according to Justice Ziegler, our conclusion in this case gives "unfettered" authority to the SPI and the "other officers." <u>See</u> Justice Ziegler's dissent, ¶248.

¶77 These allegations are simply not true. As we explained earlier in this opinion, our determination in this case "does not mean the Governor and the Secretary of Administration cannot be involved in the rule-drafting process at all . . . . the

regard to the issue presented, she would have reached the same conclusion we reach.

50

Legislature can require whatever rulemaking steps it wants as long as the SPI and DPI are able to make the final decision on the contents of a proposed rule and submit that proposed rule to the Legislature at the end of the process." See infra ¶69. Moreover, we noted "[T]he Legislature may give, may not give, and may take away the powers and duties of the SPI and the other officers of supervision of public instruction. If the Legislature does not believe the SPI should engage in rulemaking, it is free to change the statutory scheme . . . ." See infra ¶70.

¶78 To summarize, unlike Chief Justice Roggensack's Justice Ziegler's dissents, we have attempted to meaningfully interpret two equally important phrases: (1) "The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct," and (2) "and their qualifications, powers, duties and compensation shall be prescribed by law." If one chooses to address only half of the question presented, as both dissents have done, or chooses to emphasize only one of these two phrases, as both dissents have done, then we can never reach the same conclusion regardless of our agreement on many legal principles.

## IV. CONCLUSION

¶79 Our constitution is the true expression of the will of the people: it must be adopted by the people of this State, and if it is to be changed, it must be ratified by the people of this State. By adopting our constitution, the people of

51

Wisconsin gave the Legislature broad discretion to define the powers and duties of the Superintendent of Public Instruction and the other officers of public instruction. However, the will of the people as expressed by Article X, § 1 also requires the Legislature to keep the supervision of public instruction in the hands of the officers of supervision of public instruction. To do otherwise would require a constitutional amendment. Because Act 21 does not allow the SPI and DPI to proceed with their duties of supervision without the Governor's, and in some circumstances the Secretary of Administration's approval, Act 21 unconstitutionally vests the Governor and Secretary of Administration with the supervision of public instruction in violation of Article X, § 1. Accordingly, the court of appeals is affirmed.

*By the Court.*—The decision of the court of appeals is affirmed.

¶80 SHIRLEY S. ABRAHAMSON, J. *(concurring).* I conclude, as do the lead opinion (which represents the views of only Justice Gableman) and Justice Prosser's concurrence, that 2011 Wis. Act 21, which altered the process of administrative rulemaking,[1] is unconstitutional as applied to the Superintendent of Public Instruction and the Department of Public Instruction. As a result, I concur in the mandate affirming the court of appeals.

¶81 Two reasons prevent me from joining both the lead opinion and Justice Prosser's concurrence.

¶82 First, both Justice Gableman's lead opinion and Justice Prosser's concurrence give short shrift to Thompson v. Craney, 199 Wis. 2d 674, 678, 546 N.W.2d 123 (1996). Thompson has stood for 20 years as the seminal case interpreting Article X, Section 1 of the Wisconsin Constitution, which vests "the supervision of public instruction" in the superintendent. "This court follows the doctrine of stare decisis scrupulously because of our abiding respect for the rule of law."[2]

¶83 In Thompson, this court unanimously held that 1995 Wis. Act 27 was unconstitutional. Act 27 substantially reorganized the roles of the superintendent and Department of

---

[1] See Ronald Sklansky, Changing the Rules on Rulemaking, Wis. Lawyer (Aug. 2011), available at http://www.wisbar.org/newspublications/wisconsinlawyer/pages/article.aspx?Volume=84&Issue=8&ArticleID=2092 (explaining 2011 Wis. Act 21's salient modifications to the process of administrative rulemaking).

[2] Johnson Controls, Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257.

1

Public Instruction and entrusted many of the powers of the superintendent to appointed "other officers" who were not subordinate to the superintendent. Thompson held that "the legislature may not give equal or superior authority to any 'other officer.'"[3]

¶84 Although 2011 Wis. Act 21 does change the role of the superintendent somewhat differently than did 1995 Wis. Act 27, the effect of both laws is the same——both laws give "equal or superior authority" over the supervision of public instruction to officers other than those inferior to the superintendent.[4]

¶85 I agree with the court of appeals that, under Thompson, rulemaking is part of the "supervision of public instruction," which Article X, Section 1 vests in the superintendent.[5] Likewise, I agree with the court of appeals that, under Thompson, 2011 Wis. Act 21 is unconstitutional because it grants the governor (and the Secretary of the Department of Administration) an unchecked veto power over the superintendent's rulemaking powers, thereby making the superintendent subordinate to the governor (and the Secretary) in the supervision of public instruction.[6]

---

[3] Thompson, 199 Wis. 2d at 699.

[4] Thompson, 199 Wis. 2d at 699-700.

[5] Coyne v. Walker, 2015 WI App 21, ¶21, 361 Wis. 2d 225, 862 N.W.2d 606.

[6] Coyne, 361 Wis. 2d 225, ¶31.

¶86 I write to reaffirm Thompson and, applying its rationale, conclude that 2011 Wis. Act 21 is unconstitutional as applied to the superintendent and the Department of Public Instruction.

¶87 Second, I disagree with the lead opinion's unnecessary and overly broad assertion that "the Legislature may give, may not give, and may take away the powers and duties of the [superintendent] and the other officers of supervision of public instruction. If the Legislature does not believe the [superintendent] should engage in rulemaking, it is free to change the statutory scheme . . . ."[7]

¶88 If the legislature may, as the lead opinion suggests, "take away the powers and duties" of the superintendent, then the superintendent could be reduced to a role the framers of our constitution expressly rejected——that of a mere advocate for public education, unable to set standards or bring uniformity to Wisconsin's public education system.

¶89 The instant case, like Thompson, "does not require us to decide the extent to which the [superintendent's] powers may be reduced by the legislature . . . ."[8] As a result, we, like the Thompson court, should reserve judgment on that issue.

---

[7] Lead op., ¶70. A third reason I disagree with the lead opinion is its failure to be guided by judicial restraint. It goes far afield in discussing numerous matters not necessary to decide the instant case.

[8] Thompson, 199 Wis. 2d at 699-700.

¶90 Justice Prosser's concurrence explains that "the very nature of the office of superintendent required the ability to make rules, irrespective of a specific grant of authority from the legislature,"[9] and that the superintendent "must possess some inherent authority to proceed to fulfill its responsibilities."[10]

¶91 This explanation is based on our interpretive tools: the plain meaning of the words in the constitution in the context used (considering "not alone . . . the words of any part of the instrument, but by ascertaining the general purpose of the whole"[11]); the constitutional debates; the earliest legislative enactment interpreting the constitutional provision;[12] and judicial interpretation of the constitutional provision.[13] These tools of constitutional interpretation confirm that the superintendent "was intended as a crucial position, distinct from the 'other officers,' and possessing the ability to do more than merely act as an advocate for education."[14]

---

[9] Justice Prosser's concurrence, ¶150.

[10] Justice Prosser's concurrence, ¶152.

[11] Lead op., ¶43 (quotation omitted); see also lead op., ¶64.

[12] Lead op. ¶15. The importance of non-partisan, non-sectarian education was recognized in the Northwest Ordinance of 1787.

[13] Lead op. ¶42.

[14] Thompson, 199 Wis. 2d at 690.

(continued)

4

¶92 For the reasons set forth, I concur and write separately.

I

¶93 First, I agree with the court of appeals' conclusion that, adhering to <u>Thompson v. Craney</u>, 199 Wis. 2d 674, 546 N.W.2d 123 (1996), 2011 Wis. Act 21 unconstitutionally infringes on the "supervision of public instruction" vested in the superintendent by Article X, Section 1 of the Wisconsin Constitution.

¶94 Article X, Section 1 currently reads as follows:

> The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law. The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold office for 4 years from the succeeding first Monday in July. The term of office, time and manner of electing or appointing all other officers of supervision of public instruction shall be fixed by law.

¶95 In <u>Thompson</u>, the court addressed the constitutionality of 1995 Wis. Act 27.[15] Among other things, 1995 Wis. Act 27

---

For differences in methodology of interpreting the Wisconsin constitution, compare, for example, Chief Justice Roggensack's dissent, ¶¶180-206; Justice Ziegler's dissent, ¶249 n.2; <u>State ex rel. Ekern v. Zimmerman</u>, 187 Wis. 180, 184, 204 N.W. 803 (1925); <u>Buse v. Smith</u>, 74 Wis. 2d 550, 568, 247 N.W.2d 141 (1976); <u>State v. Beno</u>, 116 Wis. 2d 122, 136-37, 341 N.W.2d 668 (1984); <u>Thompson v. Craney</u>, 199 Wis. 2d 674, 680, 690, 693, 54 N.W.2d 123 (1996); <u>State v. Cole</u>, 2003 WI 112, ¶10, 264 Wis. 2d 520, 665 N.W.2d 328; <u>Dairyland Greyhound Park, Inc. v. Doyle</u>, 2006 WI 107, ¶¶114-118, 295 Wis. 2d 1, 719 N.W.2d 408 (Prosser, J., concurring in part and dissenting in part).

[15] <u>Thompson</u>, 199 Wis. 2d at 678.

created a new state Department of Education, Education Commission, and Secretary of Education appointed by the governor. Under 1995 Wis. Act 27, the Secretary of Education and the Education Commission (chaired by the superintendent of public instruction but made up of members appointed by the governor and legislative leaders) were to be responsible for "many functions related to education in Wisconsin, including some of the former duties of the [superintendent] . . . ."[16]

¶96 Craney, the respondent in Thompson, argued that 1995 Wis. Act 27 violated Article X, Section 1 of the Wisconsin Constitution by stripping the superintendent of powers of supervision of public instruction and vesting those powers in "other officers" not subordinate to the superintendent. The court unanimously agreed.[17]

¶97 In analyzing the constitutionality of 1995 Wis. Act 27, the Thompson court reviewed the text, history, judicial interpretations, and purpose of Article X, Section 1, and held that 1995 Wis. Act 27 was unconstitutional because it gave "the former powers of the elected state Superintendent of Public Instruction to appointed 'other officers' at the state level who are not subordinate to the superintendent."[18]

---

[16] Thompson, 199 Wis. 2d at 679.

[17] Thompson, 199 Wis. 2d at 698-99; see also Thompson, 199 Wis. 2d at 700 (Wilcox, J., concurring).

[18] Thompson, 199 Wis. 2d at 678-80 (citing Polk Cnty. v. State Pub. Defender, 188 Wis. 2d 665, 674, 524 N.W.2d 389 (1994)).

¶98 The Thompson court's holding that "the legislature may not give equal or superior authority to any "other officer" was based on grounds that are relevant to the instant case. In particular:

(1) "The debates at the 1846 and 1847-48 Wisconsin constitutional conventions show that the drafters of the Wisconsin Constitution intended the public schools to be under the supervision of the [superintendent], and that the [superintendent] was to be an elected, not appointed, public official." Thompson, 199 Wis. 2d at 685.

(2) The Thompson court noted "two consistent themes from these statements of the delegates: first, that the system of education required uniformity; second, that the SPI [superintendent of public instruction] was to provide this uniformity in an active manner by implementing the system of education." Thompson, 199 Wis. 2d at 688-89.

(3) The framers of the Wisconsin Constitution considered and explicitly rejected a proposal to select a superintendent by gubernatorial appointment and a proposal that would have allowed the legislature to vest "the supervision of public instruction . . . in such officers as shall hereafter be created by law." Thompson, 199 Wis. 2d at 685-86. Simply put, the framers viewed the superintendent as "indispensible," "the foundation, the life of progressive education"

7

who "alone c[ould] give uniformity, energy, and efficiency to the system." Journal of the Convention, reprinted in The Convention of 1846, at 568, 570-71 (Milo M. Quaife ed. 1919).

¶99 In the instant case, the court of appeals relied on Thompson in concluding that rulemaking is a supervisory power of the superintendent and that 2011 Wis. Act 21 unconstitutionally gives the governor and the secretary of the Department of Administration the unchecked authority to block rulemaking by the superintendent.[19]

¶100 I agree with the court of appeals' reliance on Thompson in concluding that 2011 Wis. Act 21 is unconstitutional. Although 2011 Wis. Act 21 does change the role of the superintendent somewhat differently than did 1995 Wis. Act 27, the effect of both laws is the same——both laws give "equal or superior authority" over the supervision of public instruction to officers other than those inferior to the superintendent.[20] Thus, 2011 Wis. Act 21 is unconstitutional; it gives "equal or superior authority [over the supervision of public instruction] to . . . '[an]other officer.'"[21]

¶101 The lead opinion declares that Thompson's examination of Article X, Section 1 is instructive but not dispositive

---

[19] Coyne, 316 Wis. 2d 225, ¶¶35-36.

[20] Thompson, 199 Wis. 2d at 699-700.

[21] Thompson, 199 Wis. 2d at 699.

8

because <u>Thompson</u> and the instant case pose different constitutional questions.[22]

¶102 In <u>Thompson</u>, according to the lead opinion, the question presented was whether other officers of public instruction could constitutionally be given equal or greater authority than the superintendent over the supervision of public instruction.[23] The lead opinion describes the question presented in the instant case as whether the supervision of public instruction may be vested in any officers the legislature chooses, including constitutional officers like the governor, whose offices were not created to supervise public instruction.[24]

¶103 The lead opinion's distinction of <u>Thompson</u> is without a difference. It is not persuasive. Like the court of appeals, I conclude that <u>Thompson</u> is on point and controls the instant case: <u>Thompson</u> determines the superiority of the constitutional office of superintendent over all officers in the supervision of public instruction.

¶104 Justice Prosser's concurrence (¶159) essentially argues that <u>Thompson</u> was wrongly decided because it disregarded the plain language of the constitution, the discussion surrounding the adoption of the 1902 amendment to Article X, Section 1, and subsequent legislation.

---

[22] Lead op., ¶39.

[23] Lead op., ¶39.

[24] Lead op., ¶40.

9

¶105 Justice Prosser's concurrence (¶168) disagrees with the Thompson court because it "in effect . . . preclude[s] serious changes in the present system without a constitutional amendment." Justice Prosser's concurrence (¶169) would allow constructive legislative changes regarding the superintendent of public instruction but would preclude the changes in Act 21 because they "are not constructive changes because they reallocate power without requiring accountability. Governing entails more than saying 'no.'"

¶106 I agree with Justice Prosser's ultimate conclusion that Act 21 is unconstitutional as applied to the superintendent of public instruction. I disagree, however, with Justice Prosser's treatment of Thompson.

II

¶107 Second, I caution the reader that, like Thompson, the instant case "does not require us to decide the extent to which [the superintendent of public instruction's] powers may be reduced by the legislature . . . ."[25] Thus our opinions should be read as "reserv[ing] judgment on that issue."[26]

¶108 Nevertheless, the lead opinion and the dissents unnecessarily suggest that "the Legislature may give, may not give, and may take away the powers and duties of the

---

[25] Thompson, 199 Wis. 2d at 699-700.

[26] Thompson, 199 Wis. 2d at 700; see also State v. Castillo, 213 Wis. 2d 488, ¶12, 570 N.W.2d 44 (1997) ("An appellate court should decide cases on the narrowest possible grounds.") (citing State v. Bialock, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989)).

[superintendent] and the other officers of supervision of public instruction. If the Legislature does not believe the [superintendent] should engage in rulemaking, it is free to change the statutory scheme . . . ."[27]

¶109 I do not believe it is necessary in the instant case to address or resolve the extent of the legislature's control over the superintendent's powers. The instant case concerns the constitutional relationship between the superintendent and the governor and executive branch officials. If legislative control were an issue in the instant case, however, I would agree with Justice Prosser's concurrence that the superintendent, as a constitutional officer, "must possess some inherent authority to proceed to fulfill its responsibilities."[28] "The very nature of the office of superintendent required the ability to make rules, irrespective of a specific grant of authority from the legislature."[29]

---

[27] Lead op., ¶70; see also Justice Ziegler's dissent, ¶237; Chief Justice Roggensack's dissent, ¶¶184-185.

[28] Justice Prosser's concurrence, ¶152. We have recognized a similar point in other contexts. For example, in discussing the powers of sheriffs, who are constitutional officers, in Kocken v. Wis. Council 40, AFSCME, AFL-CIO, 2007 WI 72, 301 Wis. 2d 266, 732 N.W.2d 828, the court defined the sheriffs' constitutional powers in reference to the nature of the office of sheriff as it existed when the constitution was adopted, namely the "immemorial principal and important duties that characterized and distinguished the office." Kocken, 301 Wis. 2d 266, ¶¶31-43 (citation omitted).

[29] Justice Prosser's concurrence, ¶150.

¶110 The superintendent is a constitutional officer. The office was created by Article X of the Wisconsin Constitution. Article X is entitled "Education." By addressing education and vesting the supervision of public instruction in an independent constitutional officer, the framers of the Wisconsin Constitution set education and the superintendent apart from other constitutional officers, such as, for example, the governor and lieutenant governor (Article V); the secretary of state, treasurer, attorney general, sheriffs, coroners, registers of deeds, and district attorneys (Article VI); the legislature (Article IV); and the judiciary (Article VII).

¶111 Article X, Section 1 vests the supervision of public instruction in a state superintendent as follows:

> The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law. The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold office for 4 years from the succeeding first Monday in July. The term of office, time and manner of electing or appointing all other officers of supervision of public instruction shall be fixed by law.

¶112 The original version of Article X, Section 1 included in the 1848 Wisconsin Constitution provided as follows:

> The supervision of public instruction shall be vested in a state superintendent, and such other officers as the legislature shall direct. The state superintendent shall be chosen by the qualified electors of the state, in such manner as the legislature shall provide; his powers, duties, and compensation shall be prescribed by law. . . .

12

¶113 In adopting Article X, Section 1, the framers of the 1848 constitution repeatedly expressed the fundamental importance of a robust system of public education and the "indispensable" role of the superintendent in maintaining, organizing, and advocating for public education.

¶114 Justice Prosser's concurrence (as well as Thompson, 199 Wis. 2d at 687-90) recounts much of the relevant constitutional history.[30] I restate and supplement these discussions of the relevant constitutional debates as follows.

¶115 First, as I stated before, the delegates to the constitutional conventions considered and explicitly rejected a proposal that a superintendent be selected by gubernatorial appointment and a proposal that the legislature vest "the supervision of public instruction . . . in such officers as shall hereafter be created by law."[31]

¶116 Second, the delegates to the Wisconsin constitutional convention repeatedly referred to the superintendent as "indispensable" or "necessary" to "give uniformity, energy, and efficiency to the [public education] system."[32]

¶117 The delegates suggested the superintendent would have a variety of responsibilities, including, among other things: (1) "instituting normal schools for the education of teachers,

---

[30] Justice Prosser's concurrence, ¶149.

[31] Thompson, 199 Wis. 2d at 685-86.

[32] Thompson, 199 Wis. 2d at 687-89 (quoting Journal of the Convention, reprinted in The Convention of 1846, at 568, 570-71, 573-74 (Milo M. Quaife ed. 1919)) (emphasis added).

13

appointing local superintendents, and visiting every county . . . ,"[33] (2) providing an annual report to the legislature regarding the state of schools throughout the state and keeping "a constant and vigilant watch . . . over our schools,"[34] and (3) "know[ing] what has been done in other states and countries——what has worked well and what ill——and who has practical good sense enough to select and put in operation what has been found by experience to be the best . . . ."[35]

¶118 In short, "[t]he 1846 and 1847-48 debates [at the Wisconsin constitutional conventions] demonstrate that the position of [superintendent] was intended as a crucial position, distinct from the 'other officers,' and possessing the ability to do more than merely act as an advocate for education."[36]

¶119 In light of this history and the text of the Wisconsin constitution, I agree with Justice Prosser's concurrence (¶150)

---

[33] Thompson, 199 Wis. 2d at 688 (quoting The Convention of 1846, at 570-71) (emphasis added)

[34] Thompson, 199 Wis. 2d at 688 (quoting The Convention of 1846, at 570-71).

[35] Thompson, 199 Wis. 2d at 689 (quoting Journal of the Convention, reprinted in The Attainment of Statehood, 560-61 (Milo M. Quaife ed. 1928)).

The 1846 constitutional convention emphasized uniformity and central control. The convention created a superintendent of public instruction whose exclusive job would be to establish a statewide system. See Joseph A. Ranney, "Absolute Common Ground": The Four Eras of Assimilation in Wisconsin Education Law, 1998 Wis. L. Rev. 791, 794.

[36] Thompson, 199 Wis. 2d at 690 (emphasis added).

14

that the role of the superintendent, as envisioned by the framers, requires the authority to set standards:

> [T]he framers of the constitution contemplated a superintendent of public instruction who would set standards for public schools and seek a certain uniformity among public schools throughout Wisconsin. It is self-evident that standards for schools throughout Wisconsin could not be set without the power to make rules. "Uniformity" could not be sought or enforced without rules. "Putting a <u>system</u> in operation" could not be achieved without rules. Consequently, the very nature of the office of superintendent required the ability to make rules, irrespective of a specific grant of authority from the legislature. It is hard to believe that the superintendent would have been powerless to begin to develop standards without prior legislative sanction.

¶120 For the reasons set forth, I concur and write separately.

¶121 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

15

¶122 DAVID T. PROSSER, J. *(concurring).* In the spring of 2011, the legislature enacted 2011 Wisconsin Act 21, which made numerous changes in the statutes pertaining to administrative rules. Three of these changes are at issue in this case. Peggy Coyne challenged the constitutionality of the changes embodied in sections 4, 21, and 32 of Act 21 as applied to the superintendent of public instruction, and the court of appeals affirmed the circuit court's voiding of these sections as applied to the superintendent.

¶123 Like any justice, the author of this concurrence seeks to promote readability in judicial opinions, but in attempting to interpret the constitution and the statutes correctly, this concurring opinion will follow closely the words of the constitutional provisions and the statutes to be interpreted.

I. ACT 21

A. Section 4

¶124 Wisconsin Stat. § 227.135 addresses "Statements of scope of proposed rules." Subsection (1) provides that "[a]n agency shall prepare a statement of the scope of any rule that it plans to promulgate." It then lists six pieces of information required in the statement of scope, including a description of the objective of the proposed rule and the statutory authority for the rule.

¶125 Prior to Act 21, Wis. Stat. § 227.135 (2009-10) provided in subsections (2), (3), and (4) that no state employee or official could perform any activity in connection with drafting a proposed rule until "the individual or body with

1

policy-making power over the subject matter approved the statement of scope." The individual or body could not approve the statement of scope until the 11th day after its publication by the legislative reference bureau, which was notified of the statement immediately by the agency. Notice of the statement of scope also was sent to the secretary of administration.

¶126 Section 4 of Act 21 changed subsection (2) of Wis. Stat. § 227.135, in part, as follows:

> An agency that has prepared a statement of the scope of the proposed rule shall present the statement to the governor and to the individual or body with policy-making powers over the subject matter of the proposed rule for approval. The agency may not send the statement to the legislative reference bureau for publication . . . until the governor issues a written notice of approval of the statement. The individual or body with policy-making powers may not approve the statement until at least 10 days after publication of the statement under sub. (3). No state employee or official may perform any activity in connection with the drafting of a proposed rule except for an activity necessary to prepare the statement of the scope of the proposed rule until the governor and the individual or body with policy-making powers over the subject matter of the proposed rule approve the statement.

2011 Wis. Act 21, Section 4 (emphasis added).

¶127 These changes in the law vest the governor with the power to suppress publication of the scope of a proposed rule and thus prevent the individual or body with policy-making power over the subject matter of the rule from approving any statement of scope. The governor is not required to approve the proposed rule or even to act on the rule, but no state employee in the "agency" (or elsewhere in state government) may take any action

2

to draft the proposed rule until the governor approves the statement of scope in writing.

## B. Section 21

¶128 Under prior law, several entities outside state government could petition the department of administration to direct any of five enumerated departments to prepare an economic impact report for any of the department's proposed rules. Wis. Stat. § 227.137(1)-(2) (2009-10). The secretary of administration could act on his own to order an economic impact report from any of these five departments if he determined that there would be certain economic impacts from a proposed rule.

¶129 Section 9 of Act 21 now requires every "agency" to prepare an economic impact analysis for a proposed rule before submitting it to the legislative council staff under Wis. Stat. §§ 227.15, 227.137(3).

¶130 Section 21 of the Act then reads:

> If an economic impact analysis regarding a proposed rule indicates that a total of $20,000,000 or more in implementation and compliance costs are reasonably expected to be incurred by or passed along to businesses, local governmental units, and individuals as a result of the proposed rule, the department of administration shall review the proposed rule and issue a report. The agency may not submit a proposed rule to the legislature for review under s. 227.19(2) until the agency receives a copy of the department's report and the approval of the secretary of administration.

(Emphasis added.) See Wis. Stat. § 227.137(6).

¶131 Act 21 dramatically expands the number of economic impact analyses or reports, but section 21 of the Act also permits the secretary of administration, in select cases, to

3

block a proposed rule from being submitted to the legislature for review.

## C.    Section 32

¶132 Section 32 is entirely new and reads as follows:

> Approval by governor.   After a proposed rule is in final draft form, the agency shall submit the proposed rule to the governor for approval.   The governor, in his or her discretion, may approve or reject the proposed rule.   If the governor approves a proposed rule, the governor shall provide the agency with a written notice of that approval.   No proposed rule may be submitted to the legislature for review under s. 227.19(2) unless the governor has approved the proposed rule in writing.

Wis. Stat. § 227.185 (emphasis added).

¶133 The effect of sections 4, 21, and 32 and related sections of Act 21 is to give the governor legal authority to block potential administrative rules before a statement of their scope has been published and to block draft rules before they can be submitted to the legislature for review and possible approval.   These changes go beyond providing the governor with additional notice and additional information about a proposed rule.   In essence, they vest the governor with a veto power over proposed rules—without imposing any standards on how that power is exercised and without indicating how the exercise of that power may be overridden by anyone.

¶134 This expansive power, partly shared by the secretary of administration, applies to rules promulgated by an "agency." "Agency" is defined in Wis. Stat. § 227.01(1): "'Agency' means a board, commission, committee, department or officer in state government, except the governor, a district attorney or a

4

military or judicial officer." The breadth of this definition means that Act 21's changes apply not only to all cabinet departments but also to the department of employee trust funds and to independent boards and commissions such as the investment board, the public service commission, and the tax appeals commission.

¶135 "Rule" also is broadly defined:

> "Rule" means a regulation, standard, statement of policy, or general order of general application which has the effect of law and which is issued by an agency to implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency. "Rule" includes a modification of a rule under s. 227.265.

Wis. Stat. § 227.01(13). The statute then lists multiple exceptions, including a rule which "[c]oncerns the internal management of an agency and does not affect private rights or interests." § 227.01(13)(a).

¶136 Act 21 did not alter the legislature's established powers to review proposed rules, seek the modification of proposed rules, and, if deemed necessary, suspend proposed rules. See Wis. Stat. § 227.19; see also Wis. Stat. § 227.26. However, sections 4 and 32 of Act 21 are different from Wis. Stat. § 227.19 because they do not provide specific grounds upon which the governor may choose not to approve a proposed rule. The governor is given unlimited "discretion" not to approve a proposed rule——"discretion" to do nothing about a proposed rule. By contrast, the legislature must take action if it suspends a rule.

¶137 This concentration of power in the governor may not raise serious legal questions when it is applied to a cabinet department already under the governor's control. However, the application of this new gubernatorial power to an independently elected constitutional officer who is not otherwise under the governor's direction is a different matter.

¶138 In evaluating the constitutionality of sections 4, 21, and 32 of Act 21 as applied to the superintendent of public instruction, we must remember that constitutionality should <u>not</u> be evaluated solely in terms of the present governor but also in terms of any future governor. It should not be evaluated solely in situations when a governor is supported by a friendly legislature but also in situations when a governor is opposed by the legislature. In other words, the legislation must be judged in light of different possible fact situations by neutral principles of law.

II. APPLICATION OF ACT 21 TO THE SUPERINTENDENT OF PUBLIC

INSTRUCTION

¶139 The office of superintendent of public instruction was created by the Wisconsin Constitution in 1848. Article X, Section 1 provided:

> The supervision of public instruction shall be <u>vested</u> in a state superintendent of public instruction, and such other officers as the legislature shall direct. The state superintendent shall be chosen by the qualified electors of the state, in such manner as the legislature shall provide; his powers, duties, and compensation shall be prescribed by law. Provided, that his compensation shall not exceed the sum of twelve hundred dollars annually.

6

Wis. Const. art. X, § 1 (1848) (emphasis added).

¶140 It is notable that the 1848 constitution established the office of superintendent in the same manner as it established the senate and assembly, the governor, and the judiciary:

- Article IV, Section 1: "The legislative power shall be <u>vested</u> in a senate and assembly." (Emphasis added.)

- Article V, Section 1: "The executive power shall be <u>vested</u> in a governor, who shall hold his office for two years; a lieutenant governor shall be elected at the same time, and for the same term." (Emphasis added.)

- Article VII, Section 2: "The judicial power of this state, both as to matters of law and equity, shall be <u>vested</u> in a supreme court, circuit courts, courts of probate, and in justices of the peace. The legislature may also vest such jurisdiction as shall be deemed necessary in municipal courts, and shall have power to establish inferior courts in the several counties, with limited civil and criminal jurisdiction. Provided, that the jurisdiction which may be vested in municipal courts shall not exceed, in their respective municipalities, that of circuit courts, as prescribed in this constitution; and that the legislature shall provide as well for the election of judges of the municipal courts as of the judges of inferior courts, by the qualified electors of the respective jurisdictions. The term of office of the judges of said municipal and inferior courts shall not be longer than that of the judges of the circuit courts. (Emphasis added.)

¶141 The 1848 constitution also located the office of superintendent of public instruction in Article X, entitled "Education." There was no mention of the superintendent in Article V entitled "Executive," which discussed the governor and lieutenant governor and their respective powers. Nor was there

7

any mention of the superintendent in Article VI entitled "Administrative," which discussed the secretary of state, treasurer, and attorney general, as well as sheriffs, coroners, registers of deeds, and district attorneys.

¶142 Because the "supervision of public instruction" is vested in the superintendent and because his position is set out in a separate article of the constitution, the superintendent appears to have a more significant status than the lieutenant governor and the officials named in Article VI.

¶143 At the same time, while the supervision of public instruction was vested in the state superintendent of public instruction, the constitution did not say, "The power to supervise public instruction is vested in the state superintendent of public instruction." On the contrary, the constitution specifically assigned to the legislature the authority to determine the superintendent's "powers, duties, and compensation"——as well as the "manner" of his election. The 1848 constitution also "vests" the supervision of public instruction in "such other officers as the legislature shall direct."

¶144 The 1848 constitution thus sent mixed signals about the status of the superintendent of public instruction.

¶145 Article X, Section 1 was amended in 1902 to read:

> The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties, and compensation shall be prescribed by law. The state superintendent shall be chosen by the qualified electors of the state at

8

> the same time and in the same manner as members of the supreme court, and shall hold his office for four years from the succeeding first Monday in July. The state superintendent chosen at the general election in November, 1902, shall hold and continue in his office until the first Monday in July, 1905, and his successor shall be chosen at the time of the judicial election in April, 1905. The term of office, time and manner of electing or appointing all other officers of supervision of public instruction shall be fixed by law.

Wis. Const. art. X, § 1 (1902).

¶146 In one way, the 1902 amendment heightened the unique position of the superintendent by moving his election from the partisan elections in November of the even-numbered years to the nonpartisan elections in the spring when supreme court justices are elected. Many of the early superintendents had been elected with a party affiliation at the same time as Wisconsin governors. The amendment removed them from a partisan ticket. In addition, the amendment gave the superintendent a four-year term many decades before the governor and other state officials in the executive branch received four-year terms.

¶147 On the other hand, the 1902 amendment reemphasized the role of the legislature in directing what "other officers" are vested with the supervision of public instruction and prescribing the "qualifications, powers, duties, and compensation" of both the superintendent and the "other officers." The amendment added, "The term of office, time and manner of electing or appointing all other officers of supervision of public instruction [besides the superintendent] shall be fixed by law." This sentence dispensed with any notion that "other officers" were mere "assistants and clerks" to the

9

superintendent, as was mistakenly suggested in <u>State ex rel. Raymer v. Cunningham</u>, 82 Wis. 39, 48, 51 N.W. 1133 (1892), ten years earlier.

¶148 This court interprets provisions of the Wisconsin Constitution de novo. <u>Thompson v. Craney</u>, 199 Wis. 2d 674, 680, 546 N.W.2d 123 (1996). In <u>Dairyland Greyhound Park v. Doyle</u>, 2006 WI 107, 295 Wis. 2d 1, 719 N.W.2d 408, I restated the familiar methodology we use in constitutional interpretation:

> 1. Courts should give priority to the plain meaning of the words of a constitutional provision in the context used. <u>Buse v. Smith</u>, 74 Wis. 2d 550, 568, 247 N.W.2d 141 (1976). The plain meaning of the words is best discerned by understanding their obvious and ordinary meaning at the time the provision was adopted, taking into account other (especially contemporary) provisions of the constitution. <u>See</u> <u>State ex rel. Bare v. Schinz</u>, 194 Wis. 397, 403-04, 216 N.W. 509 (1927).

> 2. Courts may view the "historical analysis of the constitutional debates and of what practices were in existence in 1848 which the court may reasonably presume were also known to the framers of the 1848 constitution." <u>Id.</u> This principle permits courts to consider the debates surrounding amendments to the constitution and the circumstances at the time these amendments were adopted. We have said that courts may examine "the history of the times," meaning not only the legislative history of a provision (including word changes in the drafts of amendments) but also "the state of society at the time," with special emphasis on the "practices and usages" then in existence, so as to identify the concerns the provision sought to address. . . .

> 3. Courts may scrutinize the earliest interpretations of the provision by the legislature as manifested in the first laws passed following adoption of the provision. Legislation that implements a constitutional provision is thought to be a fair gauge

10

of contemporary interpretation and is entitled to great deference.

Id., ¶117 (Prosser, J., concurring in part; dissenting in part) (citation omitted).

¶149 In its decision in Thompson, the court focused on the second point in our methodology by emphasizing the proceedings in the 1846 and 1848 constitutional conventions, including comments by delegates about the role of the superintendent of public instruction. See Thompson, 199 Wis. 2d at 685-90. Three quotes from the 1846 and 1848 debates are especially pertinent:

● Delegate Wallace Wilson Graham (1846) said that he "considered that officer [the superintendent] indispensable. There could be no uniform system without him. There must be an annual report of the state of schools throughout the state. There could be none, said he, so satisfactory as from a man whose entire business it is to visit and know of all the schools. He considered it a matter of the greatest importance that the legislature have all this information." Id. at 687-88 (emphasis added).

● Delegate Lorenzo Bevans (1846) said: "All admit that the children of the state are to be instructed in political economy and in the various branches of science. How is it to be accomplished? Is it by striking the word 'superintendent' from the first section of the article, by dispensing with this state officer, who alone can give uniformity, energy, and efficiency to the system." Id. at 688 (emphasis added).

● Delegate Louis P. Harvey (1848) said he wanted a superintendent who "knows what has been done in other states and countries——what has worked well and what ill and who has practical good sense enough to select and put in operation what has been found by experience to be the best. . . . An acquaintance with the particular subject of public instruction, with the peculiar qualities requisite for putting a system in operation with life and energy, was what was wanted." Id. at 689 (ellipsis in original).

11

¶150 These quotations clearly suggest that the framers of the constitution contemplated a superintendent of public instruction who would set standards for public schools and seek a certain uniformity among public schools throughout Wisconsin.[1] It is self-evident that standards for schools throughout Wisconsin could not be set without the power to make rules. "Uniformity" could not be sought or enforced without rules. "Putting a system in operation" could not be achieved without rules. Consequently, the very nature of the office of superintendent required the ability to make rules, irrespective of a specific grant of authority from the legislature. It is hard to believe that the superintendent would have been powerless to begin to develop standards without prior legislative sanction.

¶151 The legislature understood this, and so it referenced "forms and regulations for making all reports and conducting all necessary proceedings under this act" in the first legislation setting forth the duties of the superintendent:

> The superintendent shall have a general supervision over public instruction in this state, and it shall be his duty to devote his whole time to the advancement of the cause of education, and for that purpose to visit as far and as often as practicable,

---

[1] Article X, Section 3 of the 1848 constitution mirrored the uniformity theme: "The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable, and such schools shall be free and without charge for tuition to all children between the ages of four and twenty years, and no sectarian instruction shall be allowed therein." (Emphasis added.)

12

every town and school in the state for the purpose of inspecting the schools and diffusing as widely as possible by public addresses . . . and personal communication with school officers teachers and parents, a knowledge of existing defects and desirable improvements in the administration of the system, and the government and instruction of the schools: To recommend the introduction and use of the most approved text books, and to secure as far as practicable uniformity in education throughout the state: . . . To recommend the establishment of school libraries and to advise in the selection of books for the same: To collect such information as may be deemed important in reference to common schools in each county, town precinct and school district: . . . to ascertain the condition of all the school funds in this state with the amount of the school funds due to each township from lands or other sources: to propose suitable forms and regulations for making all reports and conducting all necessary proceedings under this act: to adjust and decide all controversies and disputes arising under the school lands without costs to the parties: . . . to perform such other duties as the legislature or governor of this state may direct . . . .

Laws of 1848 at 128-29, quoted in Thompson, 199 Wis. 2d at 694 (emphasis added; ellipsis in original).[2]

---

[2] The reference to "school funds" in the statute is grounded in three specific provisions in Article X of the 1848 constitution, namely, Sections 2, 4, and 5. Section 2 describes the sources of revenue for a "school fund." Sections 4 and 5 read as follows:

4. Each town and city shall be required to raise, by tax, annually for the support of common schools therein a sum not less than one-half the amount received by such town or city respectively for school purposes, from the income of the school fund.

5. Provision shall be made by law for the distribution of the income of the school fund among the several towns and cities of the state, for the support of common schools therein in some just proportion to the number of children and youth resident therein, between the ages of four and twenty

(continued)

13

¶152 The legislature has very broad power to make law. It can certainly authorize an "agency" to promulgate rules and it can establish procedures for doing so. It can change law so that the rules implementing former law must be changed. But a constitutional office must possess some inherent authority to proceed to fulfill its responsibilities. For example, it must have some authority to develop rules for its "internal management." See Wis. Stat. § 227.01(13)(a). For the superintendent of public instruction, the constitution provides the initial authority to develop rules because the constitution states the superintendent's mission. The constitution, of course, also gives the legislature the ultimate authority to determine what the superintendent may or may not do by prescribing the superintendent's powers and duties.

¶153 Over the years, the legislature has granted general authority to the superintendent to make rules. Wis. Stat. §§ 227.10, 227.11(2)(a). The legislature has sometimes required the superintendent to make rules. See, e.g., Wis. Stat. § 118.045. This has resulted in administrative rules on at least 40 different subjects, from "School district boundary

---

years and no appropriation shall be made from the school fund to any city or town for the year in which said city or town shall fail to raise such tax, nor to any school district for the year in which a school shall not be maintained at least three months.

Wis. Const. art. X, §§ 4-5 (1848).

14

appeals" and "School district standards" to "Commencement of school term" and "Grants for tribal language revitalization."

¶154 The issue in this case is whether legislation giving the governor complete authority to block a proposed rule by the superintendent of public instruction is constitutional, even when the proposed rule is authorized——perhaps required——by statute and is submitted in complete conformity with statute.

¶155 The answer cannot be yes, because it would give a governor authority to obstruct the work of an independent constitutional officer to such an extent that the officer would be unable to discharge the responsibilities that the legislature has given him. An absolute veto power over a proposed rule is a check without a balance. It is a power greater than the gubernatorial veto power in the constitution. Wis. Const. art V, § 10(2).

¶156 The power given to the governor in Act 21 provides the governor with the means not to enforce a law, even if the legislature wants it enforced, and is arguably inconsistent with the governor's obligation to take care that the laws be faithfully executed. Wis. Const. art. V, § 4.

### III. THOMPSON V. CRANEY

¶157 The reason I have written separately and have not joined Justice Gableman's opinion is that my position does not depend on the superintendent of public instruction having superiority over all other officers who are or may be vested with supervision of public instruction.

¶158 In Thompson, the court stated:

15

Our review of these sources demonstrates beyond a reasonable doubt that the office of state Superintendent of Public Instruction was intended by the framers of the constitution to be a supervisory position, and that the "other officers" mentioned in the provision were intended to be subordinate to the state Superintendent of Public Instruction. . . .

. . . .

. . . Under our holding in the present case, the legislature may not give equal or superior authority to any "other officer."

Thompson, 199 Wis. 2d at 698-99.

¶159 This holding in Thompson is unwarranted for multiple reasons. It disregards the plain language of the constitution; it disregards the discussion surrounding the constitution's formation and amendment; and it disregards subsequent legislation.

¶160 The text of Article X, Section 1 of the 1848 constitution provided:

The supervision of public instruction shall be vested in a state superintendent of public instruction, and such other officers as the legislature shall direct. The state superintendent shall be chosen by the qualified electors of the state, in such manner as the legislature shall provide; his powers, duties, and compensation shall be prescribed by law. Provided, that his compensation shall not exceed the sum of twelve hundred dollars annually.

Wis. Const. art. X, § 1 (1848).

¶161 Section 1 twice mentioned "the legislature" and gave the legislature the power to prescribe the "powers" and "duties" of the superintendent and to "vest" "other officers" with "supervision of public institutions."

16

¶162 The framers understood the realities of local education in 1848. They did not expect the superintendent to operate local schools. "Other officers" would run the public schools in Green Bay, in Milwaukee, in Prairie du Chien, in Madison. The superintendent would not run them. The superintendent would not hire teachers in Baraboo or fire school superintendents in Beloit. In the governance and operation of local schools, the superintendent was not "superior." The superintendent would be accomplishing a lot if he were able to visit local schools, as the first statute on the superintendent charged him to do.

¶163 He also did not control the University of Wisconsin. The "state university, at or near the seat of government" was never under the supervision of the superintendent of public instruction. Yet it is referenced in Article X, Section 6, directly below the section mentioning the superintendent of public instruction. The creation of a public university was part of the same "Yankee Assimilation" reform movement that inspired creation of a superintendent of public instruction. Joseph A. Ranney, "Absolute Common Ground": The Four Eras of Assimilation in Wisconsin Education Law, 1998 Wis. L. Rev. 791, 792-796.

¶164 The superintendent played no role in the sale of "school and university lands," which is mentioned in Article X, Section 7, of the 1848 Constitution. The constitution gave the secretary of state, treasurer, and attorney general that authority.

¶165 "Vested" is a potent word, but the constitution permits "other officers" to be vested with "supervision of public instruction." It should be noted that the 1848 Constitution, in Article VII, Section 2, provided that "the legislature may also <u>vest</u> such jurisdiction as shall be deemed necessary in municipal courts . . . . Provided, that the jurisdiction which may be <u>vested</u> in municipal courts shall not exceed . . . that of circuit courts." (Emphasis added.) There is no limitation on the powers of the "other officers" in Article X, Section 1, like the limitation on the jurisdiction of municipal courts.

¶166 The 1902 amendment benefitted the Superintendent in two respects, but it also firmed up the power of the legislature to prescribe the <u>qualifications</u>, <u>powers</u>, and <u>duties</u> of "other officers," thereby rebutting any notion that the elected or appointed "officers" described were mere "assistants and clerks" of the superintendent. The <u>Thompson</u> court conceded that Article X, Section 1 used the term "other officers," not the term "inferior officers," which appears in Article IV, Section 28 of the 1848 constitution. <u>Thompson</u>, 199 Wis. 2d at 683.[3] It was

---

[3] Article IV, Section 28 of the 1848 Wisconsin Constitution provided:

> Members of the legislature, and all officers, executive and judicial, except such inferior officers as may be by law exempted, shall before they enter upon the duties of their respective offices, take and subscribe an oath or affirmation to support the constitution of the United States and the constitution of the state of Wisconsin, and faithfully to discharge

(continued)

18

not too many years after the 1902 amendment was approved that the legislature created a State Board of Education consisting of the superintendent, the governor, and the secretary of state, as well as one person approved by the board of regents of the University of Wisconsin and one person approved by the board of regents of the normal schools. Laws of 1915, ch. 497, § 1.

¶167 The Thompson decision acknowledged that the language of Article X, Section 1 permits a reading that the "power of supervision may be allocated by the legislature between" the superintendent and the "'other officers' because Article X, § 1 vests supervision in the SPI and the 'other officers.'" Thompson, 199 Wis. 2d at 684. The opinion continues:

> We cannot conclude that the plain meaning of Article X, § 1 requires the SPI, and the SPI alone, to be the ultimate supervisor of public education in Wisconsin. The section is ambiguous, in that it can be read either as granting the power of supervision solely to the SPI, or as granting power to both the SPI and the "other officers" referred to in the section.

Id.

¶168 The court then adopted the narrow reading by relying on excerpts from the early constitutional debates. In so doing, it elevated individual statements (as interpreted by the court) over explicit constitutional text. The result, in effect, was to preclude serious changes in the present system without a constitutional amendment. Id. at 698. But this rigidity is contrary not only to the text but also to the statements

---

the duties of their respective offices to the best of their ability.

19

authored by the drafter of the 1902 amendment, Superintendent of Public Instruction Lorenzo Dow Harvey, who wrote:

> The last sentence [of the amendment], the one complained of, gives the legislature power at any time in the future, to entirely remodel the superintendency system if it sees fit to do so. . . . [T]his sentence of the amendment would give the legislature full power to make whatever provision might at the time be necessary.

Id. at 692 (quoting Letter from Lorenzo Dow Harvey to Karl Mathie (Oct. 15, 1902)).

¶169 State supervision of public instruction may be working beautifully as is, or it may need adjustment. But it can never be viewed as off limits to constructive change by the legislature. Unfortunately, the changes in Act 21 affecting the superintendent of public instruction are not constructive changes because they reallocate power without requiring accountability. Governing entails more than saying "no."

IV. CONCLUSION

¶170 In my view, the challenged sections of Act 21 are as unnecessary as they are unconstitutional. There are established methods for the governor to address undesirable or controversial administrative rules——by negotiation or, if necessary, by legislative suspension. In addition, the governor has the power to affect the superintendent's budget and to propose eliminating or transferring part of the superintendent's statutory authority.

20

¶171 All these options require the cooperation of the legislature. If the governor is unable to obtain that cooperation, he arguably should not succeed.

¶172 For the foregoing reasons, I respectfully concur.

¶173 PATIENCE DRAKE ROGGENSACK, C.J. *(dissenting)*. The lead opinion errs for at least three reasons: First, the lead opinion fails to recognize that when the Superintendent of Public Instruction engages in rulemaking with the Department of Public Instruction (DPI), the Superintendent is exercising legislative authority delegated to him by the legislature under Wis. Stat. § 15.37 (2013-14),[1] not constitutional authority delegated by Article X, Section 1 of the Wisconsin Constitution. Second, the lead opinion fails to recognize the legislature's constitutional authority to control its legislative delegation exercised as rulemaking by state administrative departments such as DPI.[2]  Third, Act 21 has not been applied to the Superintendent in an unconstitutional manner.

¶174 I conclude that the legislature acted pursuant to its constitutional authority under Article IV, Section 1 and Article X, Section 1 when it enacted Act 21, which creates procedural safeguards to be employed in rulemaking by DPI and many other administrative agencies.  I also conclude that Act 21 does not conflict with Thompson v. Craney, 199 Wis. 2d 674, 546 N.W.2d 123 (1996).  And finally, I conclude that the plaintiffs have not proved beyond a reasonable doubt that Act 21 has been applied unconstitutionally to the Superintendent.  Accordingly,

---

[1] All further references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[2] Lead op., ¶¶4, 57, 63.

1

I would reverse the decision of the court of appeals, and I respectfully dissent from the lead opinion.

## I. BACKGROUND

¶175 Before us, two sections of Act 21 are challenged: Wis. Stat. § 227.135(2) and Wis. Stat. § 227.185.[3] The plaintiffs and the Superintendent[4] herein claim these provisions are unconstitutional as applied to the Superintendent because they permit the Governor to reject a proposed rule or scope statement created by DPI.

¶176 The Superintendent also contends that Act 21 is an unconstitutional delegation of legislative power to the Governor because it contains neither legislative nor procedural standards for exercising that power. The Superintendent contends that Act 21 places the Governor in a superior position to the Superintendent through regulation of DPI's rulemaking in violation of Thompson.

¶177 The State contends that rulemaking is a legislative delegation to administrative agencies, and that as part of that legislative delegation, the legislature has the authority to enact procedural safeguards that apply to rulemaking. The State

---

[3] The complaint also objected to the enactment of Wis. Stat. § 227.137(6), which together with § 227.137(2) and the repeal of Wis. Stat. § 227.137(1), imposes an obligation on DPI to provide an economic impact statement for programs that are expected to exceed $20,000,000. Before us, it has not been argued that this requirement is unconstitutional as applied to the Superintendent.

[4] For convenience, hereinafter, I refer to plaintiffs and the Superintendent of Public Instruction as "the Superintendent."

2

asserts that Act 21 is such a procedural safeguard for legislative rulemaking delegations. The State acknowledges that Article X, Section 1 of the Wisconsin Constitution vests supervision of public instruction in the Superintendent, as an executive function. The State also contends that Article X, Section 1 requires that the power and duties of the Superintendent are to be established by the legislature.

¶178 Upon the Superintendent's motion for summary judgment, the circuit court struck down Wis. Stat. § 227.135(2) and Wis. Stat. § 227.185 as unconstitutional infringements of the Superintendent's constitutional powers. The court of appeals agreed with the circuit court and affirmed. As I explain below, the lead opinion errs because it fails to analyze, and instead glosses over, foundational legal principles that underlie this case.

## II. DISCUSSION

### A. Standard of Review

¶179 In order to decide the claims presented, we interpret provisions of the Wisconsin Constitution, which we undertake independently of the interpretations of the court of appeals and circuit court, while benefitting from their discussions. Custodian of Records for the Legislative Tech. Servs. Bureau, 2004 WI 65, ¶6, 272 Wis. 2d 208, 680 N.W.2d 792. We also interpret the challenged statutes, as their meanings are important to our decision. Statutory interpretation and application present questions of law that we decide

3

independently. State v. Hanson, 2012 WI 4, ¶14, 338 Wis. 2d 243, 808 N.W.2d 390.

B. Constitutional Delegations

¶180 The Superintendent's assertions require us to begin by ascertaining the nature and scope of two constitutional delegations under Article X, Section 1 of the Wisconsin Constitution: (1) the delegation to the Superintendent for the "supervision" of public instruction and (2) the delegation to the legislature to decide the extent of the Superintendent's "qualifications, powers, duties and compensation." We must understand both constitutional delegations to determine whether Act 21 violates the Superintendent's constitutional authority. This is so because the Superintendent obtains authority to supervise public instruction from the Constitution and from the legislature. Therefore, we must decide whether the statutes at issue in this review affect supervision that is constitutionally vested in the Superintendent or supervision that is legislatively created for the Superintendent.

¶181 When we interpret a constitutional provision, we examine the plain meaning of the words employed, the constitutional debates at the time of the enactment of the provision and the earliest interpretation after enactment as manifested in legislation. Schilling v. Crime Victims Rights Bd., 2005 WI 17, ¶16, 278 Wis. 2d 216, 692 N.W.2d 623 (citing Wis. Citizens Concerned for Cranes & Doves v. DNR, 2004 WI 40, ¶44, 270 Wis. 2d 318, 677 N.W.2d 612).

4

¶182 The constitutional delegations of authority to the Superintendent and the legislature, as first enacted, provided in relevant part:

> The <u>supervision of public instruction shall be vested in a state superintendent</u>, and such other officers as the legislature shall direct. The state superintendent shall be chosen by the qualified electors of the state, in such manner as the legislature shall provide; his <u>powers, duties and compensation shall be prescribed by law</u>: Provided, That his compensation shall not exceed the sum of twelve hundred dollars annually.

Wis. Const. art. X, § 1 (1848) (emphases added).

¶183 In 1902, Article X, Section 1 was amended to provide in relevant part:

> The <u>supervision of public instruction shall be vested in a state superintendent</u> and such other officers as the legislature shall direct; and their qualifications, <u>powers, duties and compensation shall be prescribed by law</u>.

Wis. Const. art. X, § 1 (1902) (emphasis added).

¶184 Article X, Section 1 vests "[t]he supervision of public instruction" in the Superintendent. This constitutional delegation has not changed materially since 1848 when Article X, Section 1 was first enacted, nor has the constitutional delegation to the legislature been changed, which delegation requires the legislature to establish the powers and duties of the Superintendent through legislation.

¶185 "Supervision" is a key term, but it is not defined in Article X, Section 1. However, as I set forth below, examination of the meaning of "supervision" at the time of the Constitutional Conventions of 1846 and 1848 shows that

5

"supervision," as used in Article X, Section 1, was understood as an executive function. It was to the legislature that the Constitution accorded the authority to determine what actions the Superintendent would be permitted to take ("powers"), and what obligations ("duties") the Superintendent must shoulder in regard to public education. Wis. Const. art. X, § 1. Stated otherwise, the framers of the Constitution chose no specific duties for the Superintendent in regard to "supervision of public instruction;" instead, the legislature was given authority to control the powers and duties of the Superintendent through legislation.

¶186 During the constitutional debates, the executive nature of the Superintendent was discussed. For example, during the Convention of 1846, Marshall M. Strong was reported to have "thought we needed [the superintendent] to travel over the state, organize the system, and awaken the people to the importance of this subject." Journal of the Convention, reprinted in The Convention of 1846, 569 (Milo M. Quaife, ed., 1919).

¶187 During the Convention of 1848, all writers were reported to have agreed that the "office should have nothing to do with the machinery of the school system or the management of the funds. . . . His province was to put the system in operation." Journal of the Convention, reprinted in The Attainment of Statehood, 556-57 (Milo M. Quaife, ed., 1928). Mr. Jackson is reported to have explained, "The duties of a superintendent were not of a fixed and well-known kind, like

6

those of political officers. Public instruction was yet in its infancy, though there had been experimenting upon it for the last fifty years." Id. at 561.

¶188 The dictionary definition of "superintend" from Webster's An American Dictionary of the English Language (new rev. ed. 1847-50) provided:

> To have or exercise the charge or oversight of; to oversee with the power of direction; to take care of with authority; as an officer superintends the building of a ship or construction of a fort.

Thompson, 199 Wis. 2d at 683. Accordingly, vesting supervision of public instruction in the Superintendent granted non-specific, executive authority to the Superintendent.

¶189 However, even though in neither 1848 nor 1902 was the Superintendent's constitutional authority defined, the plain meaning of Article X, Section 1's delegation to the legislature to establish the Superintendent's "qualifications, powers, duties and compensation" was clearly expressed. Article X, Section 1 plainly granted the legislature control over both the power that the Superintendent could exercise and the duties that the Superintendent must undertake. Early cases support this plain meaning interpretation of the legislature's control over the Superintendent.

¶190 In Raymer v. Cunningham, 82 Wis. 39, 51 N.W. 1133 (1892), we reviewed a challenge to Superintendent Wells' directive to Thomas J. Cunningham, the Secretary of State, for payments of his salary, a clerk's salary and claimed travel expenses. Id. at 39-41. In 1891, the Constitution provided that the Superintendent be paid an annual salary of not more

7

than $1,200 per year. Raymer, a citizen and taxpayer, complained that Wells had directed Cunningham to make payments in excess of $1,200, with which direction Cunningham complied. Id. at 39, 42. It was alleged that although Wells charged the state $1,000 for "clerk hire," he incurred no such expense and that Wells was paid $1,500 for traveling expenses, when he did not incur more than $800. Id. at 41-42.

¶191 During our discussion of the question presented, we construed the relationship of the Superintendent and the legislature. We said:

> While the section of the constitution cited prohibited the legislature from increasing the compensation of that officer beyond the amount named, yet it expressly authorized them to increase his duties and enlarge his powers and responsibilities *ad libitum*. This authority of the legislature has been from time to time freely exercised by especially enjoining new duties and imposing new and more onerous responsibilities.

Id. at 47. We concluded that although the legislature had increased the duties of the Superintendent since 1848 when the Constitution was ratified, nevertheless, the Superintendent had no legislative delegation to audit his own expenses and he could not receive payment above the constitutional limit even when the legislature increased his duties. Id. at 52.

¶192 The first legislation passed after Wisconsin's Constitution was ratified that bore on Article X, Section 1 was Section 3 of the Laws of 1848. Thompson, 199 Wis. 2d 693-94. The law assigned the Superintendent:

> [G]eneral supervision over public instruction in this state, and it shall be his duty to devote his whole time to the advancement of the cause of education

8

> . . . . To recommend the introduction and use of the most approved text books, and to secure as far as practicable uniformity in education throughout the state . . . . To collect such information as may be deemed important in reference to common schools in each county, town precinct and school district . . . to perform such other duties as the legislature or governor of this state may direct . . . .

Id. at 694 (quoting Laws of 1848, at 128-29) (emphasis added). Therefore, since 1848, the legislature has "by law" set the Superintendent's powers and duties, as Article X, Section 1 clearly requires. Furthermore, in 1848, the legislature permitted the governor to direct duties that the Superintendent was obligated to undertake.

¶193 The 1902 amendment to Article X, Section 1 did not impart a more definite meaning to "supervision of public instruction," nor did the amendment diminish the legislature's constitutional power over the Superintendent. The scope of the Superintendent's constitutional authority remained non-specific, executive authority as it had been in 1848.

¶194 The first law passed after the 1902 amendment was ch. 37 of the Laws of 1903. Id. at 696-97. Section 1 of ch. 37 Laws of 1903 established qualifications for the office of the Superintendent and Section 2 imposed 14 duties on the Superintendent. Briefly stated, the legislature directed the Superintendent to: ascertain conditions of Wisconsin's public schools; advise in selection of books; investigate different systems of common schools; move public sentiment to favor industrial and commercial education; formulate study for listed schools; prescribe rules for management of school libraries; examine and determine appeals referred to the Superintendent;

9

collect and purchase maps, charts, books, etc. for use in common schools; apportion and distribute the school fund; make copies of papers deposited in his office; prepare in even numbered years reports on all common schools; supervise teachers' institutes; hold one convention annually to confer with county superintendents; and "perform all other duties imposed upon him by law." §§ 1 & 2, ch. 37, Laws of 1903.

¶195 The above referenced ch. 37 of the Laws of 1903 exemplifies the breadth of the legislature's constitutional control over the powers that the Superintendent could exercise and the duties the Superintendent was, by law, obligated to fulfill. It also shows the executive nature of the constitutional grant to the Superintendent to supervise public instruction because all legislative requirements of the Superintendent relate to public instruction, and it was the legislature, not the Superintendent, that was making the choices about what tasks would be undertaken.

¶196 We previously have reviewed the legislature's power in regard to a claimed conflict between a statute and Article X. In City of Manitowoc v. Town of Manitowoc Rapids, 231 Wis. 94, 285 N.W. 403 (1939), we expressed approval of the reasoning of In re Kindergarten Schools, 32 P. 422, 422 (Colo. 1893), which provided that unless "the constitution, in express terms or by necessary implication, limits it, the legislature may exercise its sovereign power in any way that, in its judgment, will best subserve the general welfare." City of Manitowoc, 231 Wis. at 98. In so stating, we rejected a challenge based on Article X,

10

Section 3 to various statutes that provided for a statewide system of vocational schools in Wisconsin municipalities of over 5,000 inhabitants and the opportunity for free education beyond 20 years of age. Id. at 98-99.

¶197 In School District No. 3 of the Town of Adams v. Callahan, 237 Wis. 560, 297 N.W. 407 (1941), we reviewed a claim that the Superintendent's legislatively assigned task exceeded the legislature's power. There, we considered Wis. Stat. § 40.30(1) (1939), which provided: "The state superintendent is authorized, on his own motion, by order to attach districts with valuations of less than one hundred thousand dollars to contiguous districts." Id. at 566.

¶198 School District No. 3 contended that the legislature's grant of authority to the Superintendent to combine contiguous districts with valuations of less than $100,000 was unconstitutional because monetary valuation was not "germane to the purpose of the act," and the legislative delegation was outside of "matters pertaining to public instruction," which limited what power and duties the legislature could confer on the Superintendent. Id. at 566-67. We reasoned that the Superintendent acted in strict compliance with the law, Wis. Stat. § 40.30(1) (1939), and that the legislative delegation to the Superintendent was in accord with the legislature's constitutional power under Article X, Section 1. Id. at 571.

¶199 It also is significant that DPI was not in existence in 1848 when the Superintendent's authority to supervise public instruction was created. When the Constitution was enacted, the

11

Superintendent acted by issuing executive orders, some of which were held unlawful because they exceeded both the legislature's grant of authority to the Superintendent and the Superintendent's constitutional authority, as we held in Raymer, supra.

¶200 DPI was created by the legislature in 1967.[5] In 1967, the legislature also created the "educational approval board" that was "attached to the department of public instruction under s. 15.03." Wis. Stat. § 15.375 (1967). The educational approval board consisted of "representatives of state agencies and other persons with a demonstrated interest in educational programs appointed to serve at the pleasure of the governor." Id.

¶201 The educational approval board was to "exercise its powers, duties and functions prescribed by law, including rule-making . . . independently of the head of the department . . . but budgeting, program co-ordination and related management functions shall be performed under the direction and supervision of the head of the department." Wis. Stat. § 15.03 (1967). Therefore, from DPI's inception, the Superintendent was granted executive management duties; however, others (members of the educational approval board) participated with DPI, independent

---

[5] "There is created a department of public instruction under the direction and supervision of the state superintendent." Wis. Stat. § 15.37 (1967).

12

from the Superintendent, on issues involving public instruction, including rule-making.[6]

¶202 It is important to recognize that DPI has no constitutional authority. See Martinez v. DILHR, 165 Wis. 2d 687, 698, 478 N.W.2d 582 (1992). It is simply one of many administrative departments and agencies that the legislature has created. Id. at 697.

¶203 By Wis. Stat. § 15.37, as enacted and then as companion statutes were amended, the legislature granted the Superintendent authority to oversee DPI and later to engage in rulemaking with DPI. However, the Superintendent did not get his powers to supervise DPI and to engage in rulemaking from the Constitution. The Superintendent obtained these powers from the legislature through statutory enactment.

¶204 Stated otherwise, the Superintendent's rulemaking with DPI is legislatively granted supervision of DPI, not constitutionally granted supervision of DPI. This distinction about the source of the Superintendent's powers relative to DPI is important because in order for a statute to be unconstitutional as applied, it must adversely affect a constitutional power of the Superintendent. Statutes that affect statutory powers of the Superintendent are simply statutory amendments, which the legislature is always free to enact. City of Manitowoc, 231 Wis. at 98.

---

[6] The educational approval board is no longer involved with DPI, as it was in 1967.

13

¶205 The Attorney General also has examined the constitutional delegation to the Superintendent and has concluded that the scope of the Superintendent's authority "is placed within the discretion of the legislature by the use of the phrase in art. X, sec. 1, 'powers, duties and compensation shall be prescribed by law.'"  37 Op. Att'y. Gen. 347, 353 (1948).

¶206 Accordingly, I conclude that Article X, Section 1 granted the Superintendent only non-specific executive authority with regard to free public schools on a statewide basis.  The Attainment of Statehood, 556-57.  That is the extent of the Superintendent's constitutional powers.  I also conclude that Article X, Section 1 granted the legislature authority to legislate which activities (powers) the Superintendent could pursue and which obligations (duties) he was required to meet.

C.  Statutory Interpretation

¶207 Now that I have determined the scope of the constitutional delegations to the Superintendent and to the legislature under Article X, Section 1 of the Wisconsin Constitution, the next step is to decide whether Act 21 collides in an unconstitutional way with the executive authority of the Superintendent.  This requires interpretation and application of those provisions of Act 21 about which complaint has been lodged before us:  Wis. Stat. § 227.135(2) and Wis. Stat. § 227.185.

1. General principles

¶208 DPI has no power to create a law, nor has the Superintendent.  Article IV, Section 1 of the Wisconsin

14

Constitution clearly provides: "The legislative power shall be vested in a senate and assembly." Any rulemaking authority DPI has is a delegation of power from the legislature. Martinez, 165 Wis. 2d at 698-99.

¶209 In Martinez, we addressed whether the legislature's delegation to the Joint Committee for Review of Administrative Rules (JCRAR) to "temporarily suspend administrative rules pending bicameral review by the legislature and presentment to the governor for veto or other action" was lawful. Id. at 691. When JCRAR notified DILHR that it was suspending part of Wis. Admin. Code § IND. 72.01(16), DILHR told Wisconsin employers to ignore JCRAR's action suspending its rule. Id. at 692-93. The Martinez litigation followed.

¶210 In upholding JCRAR's action, we explained that "administrative agencies are creations of the legislature and [] they can exercise only those powers granted by the legislature." Id. at 697. We also explained that "rule-making powers can be repealed by the legislature." Id. at 698. Thereafter, we concluded that DILHR's arguments lacked merit in part because "it is incumbent on the legislature, pursuant to its constitutional grant of legislative power, to maintain some legislative accountability over rule-making." Id. at 701.

¶211 Here, DPI engages in rulemaking to administer statutes that involve education, which have been enacted by the legislature and signed into law by the Governor. DPI cannot make rules on any subject matter it chooses. Rather, all of its rules must relate to education. For example, Wis. Admin. Code

15

§ PI 2 establishes procedures for school district boundary appeals under Wis. Stat. ch. 117. Wisconsin Admin. Code § PI 5 establishes procedures for granting high school equivalency diplomas and certificates pursuant to Wis. Stat. § 115.29(4)(a). Wisconsin Admin. Code § PI 18 establishes course requirements to meet the graduation standards outlined by the legislature in Wis. Stat. § 118.33.

¶212 Furthermore, "[n]o agency may promulgate a rule which conflicts with state law." Wis. Stat. § 227.10(2). It is well established precedent that "[a]n administrative rule that conflicts with an unambiguous statute exceeds the authority of the agency that promulgated it." Thomas More High Sch. v. Burmaster, 2005 WI App 204, ¶15, 287 Wis. 2d 220, 704 N.W.2d 349 (internal quotation marks omitted) (quoting Seider v. O'Connell, 2000 WI 76, ¶28, 236 Wis. 2d 211, 612 N.W.2d 659).

2. Wis. Stat. § 227.135(2) and Wis. Stat. § 227.185

¶213 As usual when statutory interpretation is at issue, we begin with the words chosen by the legislature. Wis. Indus. Energy Grp., Inc. v. Pub. Serv. Comm'n, 2012 WI 89, ¶15, 342 Wis. 2d 576, 819 N.W.2d 240. If their meaning is plain, we apply that meaning and go no further. State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110.

¶214 Wisconsin Stat. § 227.135(2) is at the forefront of plaintiffs' challenge. It provides:

> An agency that has prepared a statement of the scope of the proposed rule shall present the statement to the governor and to the individual or body with policy-making powers over the subject matter of the

16

proposed rule for approval. The agency may not send the statement to the legislative reference bureau for publication under sub. (3) until the governor issues a written notice of approval of the statement. The individual or body with policy-making powers may not approve the statement until at least 10 days after publication of the statement under sub. (3). No state employee or official may perform any activity in connection with the drafting of a proposed rule except for an activity necessary to prepare the statement of the scope of the proposed rule until the governor and the individual or body with policy-making powers over the subject matter of the proposed rule approve the statement.

Section 227.135(2) unambiguously requires approval of proposed scope statements by both the Governor and the Superintendent, "the individual . . . with policy-making powers," when DPI is rulemaking. Wisconsin Stat. § 227.185 unambiguously requires that proposed rules be approved by the Governor before they can proceed further.[7] Therefore, unless they have been proved unconstitutional beyond a reasonable doubt, they must be enforced according to the plain meaning of their terms.

¶215 As I explained above, administrative rulemaking is undertaken to facilitate application of statutes that the legislature creates. It is the legislature that sets, by statute, the policy to be furthered in rulemaking. In addition,

---

[7] Wisconsin Stat. § 227.185 provides:

After a proposed rule is in final draft form, the agency shall submit the proposed rule to the governor for approval. The governor, in his or her discretion, may approve or reject the proposed rule. If the governor approves a proposed rule, the governor shall provide the agency with a written notice of that approval. No proposed rule may be submitted to the legislature for review under s. 227.19(2) unless the governor has approved the proposed rule in writing.

17

rulemaking is accomplished only through legislative delegation to an administrative agency or department. Martinez, 165 Wis. 2d at 698-99. The legislature controls the delegation of legislative authority that it accords to administrative agencies and departments to employ in rulemaking. Id. at 701.

¶216 Requiring the Superintendent to approve the scope statement of a new rule that facilitates application of statutes relating to education, clearly is within the legislature's constitutional power under Article IV, Section 1 and its authority in regard to the Superintendent under Article X, Section 1 of the Wisconsin Constitution. The lead opinion seems to agree that the legislature can require the Superintendent to approve the scope statement of proposed DPI rules.

¶217 However, the lead opinion concludes that Wis. Stat. § 227.135(2) and Wis. Stat. § 227.185 are unconstitutional as applied to the Superintendent because rulemaking is a supervisory power of the Superintendent, and by granting the Governor the power to approve the scope of a rule under § 227.135(2) and proposed rules under § 227.185, the legislature has given the Governor the power to supervise public instruction.[8]

¶218 The lead opinion errs because it misperceives two foundational legal principles that underlie this case: (1) it fails to recognize that the legislature accorded the Superintendent the power to participate with DPI in rulemaking

_____

[8] Lead op., ¶¶59-62.

18

and (2) it fails to recognize the legislature's constitutional authority under Article IV, Section 1 of the Wisconsin Constitution to control delegations of legislative power such as occurred with DPI's rulemaking.

¶219 To explain further, first, it was the legislature that granted the Superintendent the authority to direct and supervise DPI, as Wis. Stat. § 15.37 very clearly provides: "There is created a department of public instruction under the direction and supervision of the state superintendent of public instruction."

¶220 This is a statutory grant of authority from the legislature to the Superintendent. The Superintendent did not obtain the power to direct and supervise DPI from Article X, Section 1 of the Wisconsin Constitution. He got those powers from Wis. Stat. § 15.37. Therefore, in regard to rulemaking with DPI, the Superintendent has only legislative power.

¶221 There was no DPI when the Superintendent of Public Instruction was created by Article X, Section 1, nor was there rulemaking. Rather, it was the legislature that set obligations for the Superintendent with regard to DPI. Stated otherwise, it was the legislature that gave the Superintendent the power to direct and supervise DPI; not the Constitution. Compare Wis. Stat. § 15.37 with Wis. Const. art. X, Section 1. Therefore, supervision of DPI rulemaking is a statutory power of the Superintendent, not a constitutional power.

¶222 Second, the legislature has the constitutional power to control the mechanism by which rulemaking is undertaken

19

because rulemaking is a delegation of the legislature's legislative power granted in Article IV, Section 1. Without legislation, DPI would not exist and could not engage in rulemaking. Martinez, 165 Wis. 2d at 698 (explaining that an agency "has no inherent constitutional authority to make rules, and, furthermore, its rule-making powers can be repealed by the legislature").

¶223 A review of the evolution of DPI rulemaking is helpful. Initially, DPI rulemaking was directed by the educational approval board, not by the Superintendent. Wis. Stat. § 15.03 (1967). The legislature subsequently modified DPI rulemaking, granting more power over rulemaking to the Superintendent. In the statutes now under examination, the legislature again has modified DPI rulemaking by inserting procedural safeguards for the Superintendent and the Governor to oversee. This is similar to what the legislature did in Martinez when it inserted safeguards for JCRAR to oversee with regard to DILHR's rulemaking. Simply because Act 21 affects rulemaking of DPI (and many, many other agencies), it does not follow that the legislature's constitutional powers to control its own rulemaking delegations have been diminished. Id. at 701.

¶224 Furthermore, while statutes may create opportunities and obligations for the Superintendent, those opportunities and obligations come from the legislature not from the Constitution. Therefore, legislative modification of the powers and duties of

the Superintendent in DPI rulemaking are within the legislature's constitutional authority.

¶225 In regard to the interaction of the Superintendent and the legislature, Article X, Section 1 grants the legislature the right to exercise control over duties that relate to education that the Superintendent must undertake. The legislature has broad constitutional power over the Superintendent, so long as the duties assigned do not fall outside of public instruction, as it was alleged to have occurred in School District No. 3, supra. No challenge in this regard has been raised with regard to Wis. Stat. § 227.135(2) and Wis. Stat. § 227.185.

¶226 Furthermore, simply because the legislature creates an opportunity or an obligation for the Superintendent, it does not follow that those opportunities and obligations are of constitutional magnitude. However, the lead opinion has conflated the Superintendent's constitutional executive authority to supervise public instruction with his statutory authority to supervise DPI, which later type of supervision is not of constitutional dimension.

¶227 In addition, my decision is consistent with Thompson. Thompson was concerned with "other officers" mentioned in Article X, Section 1, one of which was to be Secretary of Education, and whether their authority was inferior to that of the Superintendent. Thompson, 199 Wis. 2d at 683-84. The matter before us does not concern the "other officers" mentioned in Article X, Section 1.

21

¶228 In Thompson, we did not examine whether duties of the Superintendent that had been required by legislation could subsequently be modified by the legislature.[9] Thompson was not concerned with rulemaking; therefore, we did not consider the constitutional power of the legislature when it delegates rulemaking authority, as I have done here.

¶229 However, without recognizing the effect of its decision, the lead opinion increases the executive power granted to the Superintendent in Article X, Section 1 to include the power to legislate, which the Constitution clearly reserves to the legislature; treats the DPI as though it has constitutional power; and reduces the constitutional power of the legislature to control its delegations of legislative power in rulemaking, all in contravention of Article IV, Section 1 and Article X, Section 1. However, courts are not free to change constitutional delegations, and Article X, Section 1 explicitly states how the constitutional delegations to the legislature and to the Superintendent are to coexist.

D. Constitutional Violation

¶230 Finally, in order to succeed before us, the Superintendent must prove beyond a reasonable doubt that Wis. Stat. § 227.135(2) or Wis. Stat. § 227.185 was unconstitutionally enforced against him. Society Ins. v. LIRC,

---

[9] In Thompson, we left open "the extent to which the [Superintendent's] powers may be reduced by the legislature, and we reserve[ed] judgment on that issue." Thompson v. Craney, 199 Wis. 2d 674, 700, 546 N.W.2d 123 (1996).

22

2010 WI 68, ¶27, 326 Wis. 2d 444, 786 N.W.2d 385. In examining the constitutionality of the challenged statutes, the phrase "beyond a reasonable doubt" expresses the "force or conviction" with which we must conclude, as a matter of law, that a statute has been enforced unconstitutionally against the Superintendent. See League of Women Voters of Wis. Educ. Network, Inc. v. Walker, 2014 WI 97, ¶17, 357 Wis. 2d 360, 851 N.W.2d 302.

¶231 No proof has been submitted that either Wis. Stat. § 227.235(2) or Wis. Stat. § 227.185 has been unconstitutionally enforced against the Superintendent. First, in order for either statute to be unconstitutional as applied, enforcement of § 227.235(2) or § 227.185 must adversely affect a constitutional power of the Superintendent. However, Act 21's administrative rulemaking safeguards impose conditions on only the Superintendent's statutory powers, not on his constitutional authority. There has been no proof that either § 227.235(2) or § 227.185 interferes with the Superintendent's executive authority to supervise existing rules and laws affecting public instruction.

¶232 Second, the Superintendent concedes that the legislature could take away all rulemaking power from the Superintendent because rulemaking is a legislative delegation of authority.[10] This concession belies the Superintendent's assertion that rulemaking is constitutionally granted supervision of public instruction. Furthermore, when rulemaking

---

[10] Coyne Brief at 15, 23.

23

was introduced to DPI in 1967, the "educational approval board" exercised "powers, duties and functions prescribed by law, including rule-making," which actions were set out independently from the executive functions reserved to the Superintendent. Wis. Stat. § 15.03 (1967) (emphasis added). In addition, members of the "educational approval board" were appointed by the Governor.[11] Accordingly, I conclude that the Superintendent has failed to meet his burden of proof; and therefore, his constitutional challenge before us fails.

### III. CONCLUSION

¶233 I conclude that the legislature acted pursuant to its constitutional authority under Article IV, Section 1 and Article X, Section 1 of the Wisconsin Constitution when it enacted Act 21, which creates procedural safeguards to be employed in rulemaking by DPI and many other administrative agencies. I also conclude that Act 21 does not conflict with Thompson. And finally, I conclude that the plaintiffs have not proved beyond a reasonable doubt that Act 21 has been applied unconstitutionally to the Superintendent. Accordingly, I would reverse the decision of the court of appeals and I respectfully dissent from the lead opinion.

---

[11] The involvement of the Governor in education in the 1967 statute is consistent with the first legislation passed after Wisconsin's Constitution was ratified in 1848, where some of the duties of the Superintendent were described specifically and some generally as, "such other duties as the legislature or governor of this state may direct." § 3, Laws of 1848, at 129 (emphasis added).

24

¶234 I am authorized to state that Justices ANNETTE KINGSLAND ZIEGLER and REBECCA G. BRADLEY join this dissent.

¶235 ANNETTE KINGSLAND ZIEGLER, J. *(dissenting)*. I join the dissent authored by Chief Justice Roggensack because I agree that, based on the arguments raised in this case, the respondents have failed to establish that the provisions of 2011 Wisconsin Act 21 ("Act 21") at issue are unconstitutional beyond a reasonable doubt as applied to the Superintendent of Public Instruction ("SPI"). I write to emphasize a few points.

¶236 First, there are numerous significant areas of agreement between the lead opinion and Chief Justice Roggensack's dissent. Most importantly, the lead opinion and the dissent agree that the Wisconsin Constitution "gives the Legislature control over what powers the SPI and the other officers of supervision of public instruction possess in order to supervise public instruction" such that "the Legislature may give, may not give, and may take away the powers and duties of the SPI and the other officers of supervision of public instruction." Lead op., ¶70; see dissent, ¶189. The lead opinion and the dissent also agree that the SPI's ability to participate in the rulemaking process derives from statute, not the Wisconsin Constitution. Lead op., ¶¶35-37; dissent, ¶¶203-04.

¶237 One need look no further than Article X, Section 1 itself for these propositions: "The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties, and compensation shall be

1

prescribed by law." Wis. Const. Art. X, § 1 (emphases added). Our case law confirms this notion:

> Article X, sec. 1, explicitly provides that the powers and duties of the school superintendent and other officers charged by the legislature with governing school systems "shall be prescribed by law." Because the constitution explicitly authorized the legislature to set the powers and duties of public instruction officers, Article X, sec. 1 confers no more authority upon those officers than that delineated by statute.

Fortney v. Sch. Dist. of West Salem, 108 Wis. 2d 167, 182, 321 N.W.2d 225 (1982) (emphasis added). Article X, Section 1 therefore does little more than create a constitutional position: the framers of the Wisconsin Constitution wanted to ensure that some officer was in place to oversee Wisconsin's system of public instruction. What supervision means in the context of public instruction, the framers left to the legislature to decide. The framers provided the clay; the legislature shapes it.

¶238 So much for the areas of agreement. Broadly speaking, the lead opinion and the dissent part ways on the question of whether the legislature can tie its own hands depending on the powers it grants the SPI and the duties it requires of the SPI. The court of appeals below clearly thought the answer to this question is yes. It stated, "[T]he legislature has the authority to give, to not give, or to take away SPI supervisory powers, including rulemaking power. What the legislature may not do is give the SPI a supervisory power relating to education and then fail to maintain the SPI's supremacy with respect to that power." Coyne v. Walker, 2015 WI App 21, ¶25, 361

2

Wis. 2d 225, 862 N.W.2d 606. Importantly, the court of appeals premised this principle on Thompson v. Craney, 199 Wis. 2d 674, 546 N.W.2d 123 (1996), in which we held that "the 'other officers' mentioned in [Article X, Section 1 of the Wisconsin Constitution] were intended to be subordinate to the state [SPI]" and that therefore "the legislature may not give equal or superior authority to any 'other officer.'" Thompson, 199 Wis. 2d at 698-99.

¶239 The lead opinion and the dissent agree that Thompson is not really at issue in this case, however, because the Governor and the Secretary of Administration are not Article X officers of public instruction. See lead op., ¶¶39-40 ("[T]his case poses a different constitutional question than the question posed in Thompson. . . . [H]ere, the Legislature is attempting to give officers who are not officers of supervision of public instruction the ability to prevent the SPI from promulgating rules."); dissent, ¶227 ("Thompson was concerned with 'other officers' mentioned in Article X, § 1 . . . . The matter before us does not concern the 'other officers' mentioned in Article X, § 1.").

¶240 Thus, the lead opinion does something new: it takes the Thompson idea that, with regard to Article X officers, "the legislature may not . . . give the SPI a supervisory power relating to education and then fail to maintain the SPI's supremacy with respect to that power," and applies it to individuals——the Governor and the Secretary of Administration—— who are not Article X officers. Put differently, the lead

3

opinion decides today that if the legislature grants the SPI a power, the SPI must have "supremacy with respect to that power" both with regard to Article X officers and with regard to non-Article X officers.

¶241 In so doing, the lead opinion seriously errs. To see why, let us follow the lead opinion's chain of reasoning. We begin with the lead opinion's premises: (1) the legislature may "give, may not give, and may take away the powers and duties of the SPI and the other officers of supervision of public instruction," that is, the manner in which the SPI and other officers supervise public instruction, lead op., ¶¶70, 72; (2) the legislature has defined the supervision of public instruction to include rulemaking, lead op., ¶35; (3) the supervision of public instruction, however defined by the legislature, must be vested in the SPI and the other officers of supervision of public instruction, lead op., ¶63; (4) the Governor and the Secretary of Administration are not Article X officers, id.; and (5) the legislature has given the Governor and the Secretary of Administration "the power to make the decision on whether the rulemaking process can proceed," lead op., ¶68. Now, the denouement: "By giving the Governor the power to prevent the SPI's and DPI's proposed rules from being sent to the Legislature, Act 21 [unconstitutionally] gives the Governor the authority to [supervise] public instruction." Lead op., ¶65.

¶242 I cannot subscribe to this reasoning because it fails to account for the unconquerable nature of the first of the

4

premises listed above: the legislature may give, may not give, and may take away the powers and duties of the SPI and the other officers of supervision of public instruction, that is, the manner in which the SPI and other officers supervise public instruction. We have stated this idea before: "Article X, sec. 1 confers no more authority upon . . . officers [of supervision of public instruction] than that delineated by statute." Fortney, 108 Wis. 2d at 182. Thus, the supposed limit on the legislature's authority envisioned by the lead opinion is not really a limit at all; the legislature can simply redefine the "supervision of public instruction" in a way that accommodates that which the legislature wishes to achieve.

¶243 More specifically, in the lead opinion's view, the legislature defined "supervision of public instruction" to mean (in part) "rulemaking," and "rulemaking" to mean "the ability to promulgate public instruction-related rules." But rulemaking is not some unchangeable Platonic Form. I see nothing in Article, X, § 1 that prevents the legislature from defining "supervision of public instruction" to mean (in part) "rulemaking," and "rulemaking" to mean "the ability to promulgate public instruction-related rules subject to gubernatorial approval."

¶244 Imagine that, prior to 2011, the legislature had never given the SPI any authority to participate in the rulemaking process, and that Act 21 represented the legislature's first grant of rulemaking authority to the SPI——rulemaking subject to gubernatorial approval. Act 21 would thus represent an expansion, not a contraction, of the SPI's powers. Why would

5

this be unconstitutional? The legislature is simply "prescrib[ing]" the "powers" of the SPI under Article X, Section 1 of the Wisconsin Constitution. It cannot be that the legislature can only expand, and never contract, powers. Under the lead opinion's reasoning, the legislature's ability to "prescribe[]" the SPI's "powers" is so limited. The lead opinion's logic suggests that if any power is to be prescribed to the SPI, it must be prescribed without any limitation. This logic is fundamentally flawed because this requirement is not found in the Wisconsin Constitution.

¶245 Article X, Section 1 vests the SPI with the supervision of public instruction and states that the SPI's "powers . . . shall be prescribed by law," not that its "other powers" shall be prescribed by law. Wis. Const. Art. X, § 1; see Fortney, 108 Wis. 2d at 182. Thus while it is true that Article X vests the SPI with "[t]he supervision of public instruction," Act 21 cannot be unconstitutional because the "supervision of public instruction" is some independent power of the SPI. Further, this court has already determined that "[p]ublic instruction and its governance had no long-standing common law history at the time the Wisconsin Constitution was

enacted." Fortney, 108 Wis. 2d at 182. "Supervision of public instruction" connotes no special grant of common law powers.[1]

¶246 So this case is not, ultimately, about the powers of the SPI. It is instead about whether the legislature can create a chain of command. The lead opinion concludes that it is not within the province of the legislature to create such a chain of command. The words of the constitution do not so limit the legislature.

¶247 Is the lead opinion correct to conclude that if the SPI supervises public instruction, and the Governor supervises the SPI, then the Governor is (unconstitutionally) supervising public instruction? The answer is no, because it is not really the Governor who is supervising (or even obstructing, if one prefers) the actions of the SPI; it is the legislature. That is, built into the very idea of the SPI's supervision of public instruction is the idea that this supervision will forever be qualified and controlled by the legislature. It is the legislature that defines what "supervision of public instruction" is; "[p]ublic instruction and its governance had no

---

[1] This case, which involves the SPI's authority under Article X, section 1 of the Wisconsin Constitution, should therefore be distinguished from cases involving a provision "which incorporates an ancient common law office, possessing defined powers and duties, into the constitution." Fortney v. School Dist. of West Salem, 108 Wis. 2d 167, 182, 321 N.W.2d 225 (1982). For instance, "[p]rior decisions of this court held that the sheriff, under common law, had certain powers and duties in his relationship to the courts which were incorporated into the constitution. The sheriff cannot be divested of those powers and duties by statute." Id. The lead opinion today would not affect existing law on these types of offices.

7

long-standing common law history at the time the Wisconsin Constitution was enacted." <u>Fortney</u>, 108 Wis. 2d at 182. It is the legislature which determines the powers the SPI may wield, and the way in which the SPI may wield those powers. <u>See</u> Wis. Const. Art. X, § 1. In short, it is the legislature which decides what it <u>means</u> to supervise public instruction in Wisconsin. The legislature has determined through Act 21 that the supervision of public instruction in Wisconsin means, in part, participation in the rulemaking process with respect to specific matters and subject to gubernatorial approval. Alas, the lead opinion determines that our state constitution prohibits the legislature's actions.

¶248 The lead opinion's conclusions today could yield undesirable and unintended consequences. Suppose the legislature, in light of school shootings in recent years, decides to increase security at Wisconsin's public schools. The legislature might wish to provide the SPI with rulemaking authority over the implementation of this plan. But, given the nature of the issue, the legislature might also conclude that the Governor's input on any proposed rules should be dispositive. Under the lead opinion today, it seems that the legislature could: (1) give the SPI the authority to pass rules on school security without conditioning the submission of these rules to the legislature on the Governor's approval; or (2) give the Governor's office a measure of authority over the implementation of the plan, without involving the SPI at all. What it could <u>not</u> do, at least apparently, is give the SPI the

8

authority to pass rules on school security, subject to the approval of the Governor; the lead opinion's reasoning suggests that while the legislature need not give any authority at all to the SPI on a matter such as public school security, if it in fact chooses to give any such authority, that authority must be unfettered. I fail to see why Article X, Section 1 would require such an outcome, given that that provision provides that the powers of the SPI are prescribed by the legislature. Wis. Const. Art. X, § 1. The legislature may reasonably wish to give the SPI qualified authority over the implementation of the law at issue, yet the lead opinion forces the legislature to choose between two imperfect solutions.

¶249 I suspect that the reason the dissent's view leaves a sour taste in the lead opinion's mouth is because the SPI, under the dissent's interpretation, is a rather weak entity, at least insofar as it is subject to the changing whims of the legislature. But this consequence is dictated by the broad language of Article X, Section 1, which gives virtually complete authority over the SPI to the legislature. The framers did not provide that the SPI constitutes the fourth branch of our state government. That the plain language[2] of Article X does not leave

---

[2] The lead opinion states:

> When interpreting a constitutional provision we do not rest our analysis on the language of the provision alone. Rather, we also consult the constitutional debates and the practices in existence at the time of the writing of the constitutional provision and the interpretation of the provision by the Legislature as manifested in the laws passed following its adoption.

(continued)

9

the SPI with some set of "core" powers is not a problem for this court to resolve. See Lead op., ¶79.

---

Lead op., ¶52 (citation omitted).

"Our methodology in interpreting a constitutional provision is not identical to our methodology in interpreting a statute." Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, ¶114, 295 Wis. 2d 1, 719 N.W.2d 408 (Prosser, J., concurring in part, dissenting in part). Although justifications for this divergence have, in the past, been provided, see, e.g., id., ¶116, I am not convinced that the current methodology this court uses to interpret constitutional language is sound. See, e.g., State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶52, 271 Wis. 2d 633, 681 N.W.2d 110 ("Ours is 'a government of laws not men,' and 'it is simply incompatible with democratic government, or indeed, even with fair government, to have the meaning of a law determined by what the lawgiver meant, rather than by what the lawgiver promulgated.' . . . 'It is the law that governs, not the intent of the lawgiver. . . . Men may intend what they will; but it is only the laws that they enact which bind us" (citations omitted).); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 375 (2012) ("The English judges have frequently observed, in answer to the remark that the legislature meant so and so, that they in that case have not so expressed themselves, and therefore the maxim applied, quod voluit non dixit [What it wanted it did not say]." (quoting 1 James Kent, Commentaries on American Law 467 (1826)); Daniel R. Suhr, Interpreting the Wisconsin Constitution, 97 Marq. L. Rev. 93, 120 (2012) ("The considerations that drove the [Wisconsin Supreme Court's] majority in Kalal should lead it to reject the current method it uses to interpret the state constitution. The [current] methodology relies on flawed sources in a futile attempt to discover a mythical common intent.").

Additionally, this methodology was not previously applied in Coulee. See Coulee Catholic Schools v. LIRC, 2009 WI 88, 320 Wis. 2d 275, ¶57, 768 N.W.2d 868 (interpreting the Wisconsin Constitution and stating, "The authoritative, and usually final, indicator of the meaning of a provision is the text——the actual words used"); id., n.25 ("In this case, we see little reason to extend our interpretation beyond the text."). Consequently, I would be willing to reexamine the methodology this court currently employs when interpreting constitutional text.

10

¶250 The last point I wish to discuss is the lead opinion's conclusion that Act 21 is unconstitutional "as applied." Unlike the lead opinion, I conclude that the respondents fail to establish that Act 21 is unconstitutional beyond a reasonable doubt as applied to the SPI because they have not shown that Act 21 has actually been applied to the SPI. The respondents do not assert that the Governor or the Secretary of Administration have rejected a rule proposed by the SPI or the DPI, or have, for instance, rendered the SPI powerless by rejecting every rule it and the DPI have promulgated since Act 21's passage. See dissent, ¶231 ("No proof has been submitted that either Wis. Stat. § 227.235(2) or Wis. Stat. § 227.185 has been unconstitutionally enforced against the Superintendent."). Despite the lead opinion's conclusions, I am not convinced that this case is in fact an as-applied challenge. The SPI is really arguing that Act 21 is always unconstitutional when the entity concerned is the SPI. And although this is a declaratory judgment action, this matter is not ripe.

¶251 The lead opinion responds that "Act 21 does not have to have been enforced for Coyne to properly bring a claim via a declaratory judgment action," because the "Uniform Declaratory Judgments Act, Wis. Stat. § 806.04, allows 'controversies of a justiciable nature to be brought before the courts for settlement and determination prior to the time that a wrong has been threatened or committed.'" Lead op., ¶¶27-28 (citing Olson v. Town of Cottage Grove, 2008 WI 51, ¶28, 309 Wis. 2d 365, 749 N.W.2d 211). This argument is fine so far as it goes, but the

11

problem is that it is not <u>clear</u> how far it goes: "Though the authority to declare rights under the Uniform Declaratory Judgment Act is broad, it is not unlimited in scope." <u>Putnam v. Time Warner Cable of Se. Wis.</u>, 2002 WI 108, ¶72, 255 Wis. 2d 447, 649 N.W.2d 626 (Sykes, J., dissenting in part) (citation omitted). As the lead opinion points out, a controversy is not justiciable for purposes of a declaratory judgment action unless it is "ripe for judicial determination." Lead op., ¶28 (citation omitted). "The basic rationale of the 'ripeness' doctrine is to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative or . . . legislative policies." <u>Lister v. Bd. of Regents</u>, 72 Wis. 2d 282, 308, 240 N.W.2d 610 (1976). Ripeness requires that "the facts be sufficiently developed to allow a conclusive adjudication." <u>Olson</u>, 309 Wis. 2d 365, ¶43 (citations omitted). I have significant doubts that this court possesses the information it needs to pronounce a wholesale invalidation of the challenged provisions of Act 21 as they apply to the SPI.

¶252 The lead opinion argues that Walker and Huebsch did not contest ripeness (among other things) below, lead op., ¶28, but that is not dispositive. "[T]he question of ripeness may be considered on a court's own motion." <u>Nat'l Park Hosp. Ass'n v. Department of Interior</u>, 538 U.S. 803, 808 (2003) (citation omitted); <u>see also</u> <u>Blanchette v. Conn. General Ins. Corps.</u>, 419 U.S. 102, 138 (1974) ("[T]o the extent that questions of ripeness involve the exercise of judicial restraint from

12

unnecessary decision of constitutional issues, the [c]ourt must determine whether to exercise that restraint and cannot be bound by the wishes of the parties.").

¶253 Though styling the case as an as-applied challenge, the lead opinion concludes that, beyond a reasonable doubt, the challenged provisions of Act 21 can never be applied constitutionally to the SPI. See lead op., ¶¶4, 24-30. In my view, the facts have not sufficiently developed to permit such a sweeping conclusion. Assuming the Governor will eventually reject a proposed rule, we do not know what the substance of that rule will be, whether the rule impinges on any constitutional powers of the Governor, what reasons, if any, the Governor might have for rejecting a proposed rule, what changes, if any, the Governor might request, and so on. "[I]n an as-applied challenge, we assess the merits of the challenge by considering the facts of the particular case in front of us, 'not hypothetical facts in other situations.'" State v. Wood, 2010 WI 17, ¶13, 323 Wis. 2d 321, 780 N.W.2d 63 (citation omitted). Yet the focus of the lead opinion is precisely that——hypothetical facts in other situations. See, e.g., lead op., ¶68 ("[A] Governor at loggerheads with an SPI over the content of a proposed rule, or a proposed rule change, could use the threat to withhold approval as a means of affecting the rule content" (citation omitted).).

¶254 Although it would not formally invalidate Act 21 as under a facial challenge——Act 21 remains in effect with respect to entities other than the SPI——the lead opinion acknowledges

13

that the respondents' action "contains elements of . . . a facial . . . challenge." Lead op., ¶26. The respondents claim that, where the SPI is involved, Act 21 "cannot be enforced 'under any circumstances.'" Wood, 323 Wis. 2d 321, ¶13. It seems, then, that as to the SPI, the lead opinion concludes that Act 21 is always invalid, not just under "the facts of the particular case in front of us." Id. I would conclude that this facial challenge does not survive scrutiny.

¶255 The Supreme Court of the United States has stated:

> Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "anticipate a question of constitutional law in advance of the necessity of deciding it" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people."

Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450-51 (2008). These considerations apply to the present case, and bolster my conclusion that this case is not in the proper posture for the determination the lead opinion makes today.

¶256 Today's decision is not really a victory for the SPI——or Wisconsin, for that matter. It is easy to see where Coyne v. Walker could take us. If the legislature cannot maintain what

14

it views as sufficient control over the SPI's exercise of its powers, it could simply exercise its own authority to remove those powers, even though a grant of qualified authority to the SPI might well have benefitted public instruction in Wisconsin more than a complete absence of any such authority. Rulemaking stems in part from the fact that "[t]he legislature recognizes the need for efficient administration of public policy. . . . The delegation of rule-making authority is intended to eliminate the necessity of establishing every administrative aspect of general public policy by legislation." Wis. Stat. § 227.19(1)(b) (2013-14) (emphasis added). Given today's decision, the legislature may feel compelled to pass legislation regarding these administrative aspects of public instruction, even though it might otherwise have delegated this authority to the SPI, subject to gubernatorial review. In my view, Article X, Section 1 does not require such an inefficient result.

¶257 In sum, I join the dissent authored by Chief Justice Roggensack because I agree that, based on the arguments raised in this case,[3] the respondents have failed to establish that the

---

[3] The legislation in this case raises a host of constitutional questions that, appropriately, are not answered by the lead opinion. For instance, the lead opinion does not examine whether Act 21's grant of authority to the Governor and Secretary of Administration to reject proposed rules contains or need contain an ascertainable legislative purpose and procedural safeguards to ensure that the Governor and Secretary of Administration act within that purpose in exercising their authority. Cf. J.F. Ahern Co. v. Wisconsin State Bldg. Com'n, 114 Wis. 2d 69, 90, 336 N.W.2d 679 (Ct. App. 1983) (citing Watchmaking Examining Bd. v. Husar, 49 Wis. 2d 526, 536, 182 N.W.2d 257 (1971)).

15

provisions of Act 21 at issue are unconstitutional beyond a reasonable doubt as applied to the SPI.

¶258 For the foregoing reasons, I respectfully dissent.

¶259 I am authorized to state that Justice REBECCA G. BRADLEY joins this dissent.